**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Gerard H. Uzzi
Andrew C. Ambruoso (admitted *pro hac vice*)
Eric K. Stodola (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email: tlauria@whitecase.com
Email: gkurtz@whitecase.com
Email: guzzi@whitecase.com
Email: andrew.ambruoso@whitecase.com
Email: estodola@whitecase.com

**TEICH GROH**
Brian W. Hofmeister
691 State Highway 33
Trenton, NJ 08619
Telephone: (609) 890-1500
Facsimile:  (609) 890-6961
E-mail: bhofmeister@teichgroh.com

*Counsel for Beal Bank, S.S.B., and Beal Bank Nevada*

| | |
|---|---|
| In re:<br><br>TCI 2 HOLDINGS, LLC, et al.,<br><br>Debtors. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY HONORABLE RENEE M. BUMB CASE NO. 1:09-CV-5137 (RMB) |
| BEAL BANK, S.S.B., AND BEAL BANK NEVADA,<br><br>Appellants,<br><br>v.<br><br>AD HOC COMMITTEE OF HOLDERS OF 8.5% SENIOR SECURED NOTES DUE 2015,<br><br>Appellees. | Sat Below:<br>Honorable Judith H. Wizmur<br>Case No. 09-13654 (JHW)<br>Chapter 11<br><br>(Jointly Administered) |

**BRIEF OF APPELLANTS, BEAL BANK, S.S.B., AND BEAL BANK NEVADA**

Of Counsel and On the Brief:

| | | |
|---|---|---|
| Thomas E Lauria | Gerard H. Uzzi | Eric K. Stodola |
| Glenn M. Kurtz | Andrew C. Ambruoso | |

# TABLE OF CONTENTS

STATEMENT OF BASIS OF APPELLATE JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES PRESENTED ........................................................................ 1

STANDARD OF REVIEW ................................................................................................... 2

STATEMENT OF THE CASE ............................................................................................... 2

  Introduction .............................................................................................................. 2

  Summary of Proceedings Below .............................................................................. 5

  Statement of Facts .................................................................................................... 7

ARGUMENT ................................................................................................................... 13

  I.    The Bankruptcy Court Erroneously Relied on LaSalle as the Basis to Terminate
        the Debtors' Exclusivity ...................................................................................... 13

        A.    Under LaSalle, the Failure to Market Assets When a Plan Provides "Old
              Equity" with the Exclusive Right to Invest New Capital is a Basis for Denying
              Confirmation of the Plan, not a Basis for Terminating Exclusivity. ................... 16

        B.    The Potential Applicability of LaSalle at a Confirmation Hearing After a Full
              Evidentiary Record has been Made is not a Basis for Terminating Exclusivity
              Without the Existence of Any Such Evidentiary Record ..................................... 17

        C.    The Bankruptcy Court Erroneously Applied LaSalle Without Determining (i)
              Whether Mr. Trump Exerted Any Control Over the Debtors' Estates During
              the Plan Process and (ii) Whether Mr. Trump Held Any Equity Interest in the
              Debtors as of the Petition Date. ............................................................................ 17

        D.    LaSalle, When and to the Extent Applicable, Requires that Assets be Exposed
              to Market Testing, not that Market Testing Occur After a Deal has been
              Struck. .................................................................................................................... 21

        E.    LaSalle Does not Restrict Who an In-the-Money Stakeholder, Such as Beal
              Bank, Can Choose to be Its Business Partner in a Plan of Reorganization. ......... 22

        F.    LaSalle is Inapplicable Where, as Here, the Objector Fails to Establish that it
              has a Protectable Economic Stake in the Outcome ............................................... 23

  II.   The Bankruptcy Court Erred Because the Ad Hoc Committee Did Not Satisfy
        the "Especially Heavy" Burden Required to Terminate the Debtors' Period of
        Exclusivity ........................................................................................................... 24

        A.    The Bankruptcy Court Erred by Applying a Lesser Burden of Proof in View
              of the Debtors' Previously Obtained a 45-Day Extension of Exclusivity. ........... 24

B.    The Bankruptcy Court Erred in Finding that the Ad Hoc Committee had Demonstrated Sufficient Cause to Terminate Exclusivity.................................... 26

CONCLUSION........................................................................................................................ 32

## TABLE OF AUTHORITIES

### CASES

Bank of America Nat'l Trust and Savs. Ass'n v. 203 North LaSalle Street P'ship, 526 U.S. 434 (1999).................................................................................................................... *passim*

In re Adelphia Commc'ns Corp., 352 B.R. 578 (Bankr. S.D.N.Y. 2006) .............................. 28, 32

In re Burns & Roe Enters., Inc., No. 0041610, 2005 WL 6289213 (Bankr. D.N.J. Nov. 2, 2005) .................................................................................................................................. 25

In re Cardinal Congregate I, 121 B.R. 760 (Bankr. S.D. Ohio 1990)........................................... 17

In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176 (Bankr. D.N.J. 2002) ............................... 28

In re Crescent Beach Inn, Inc., 22 B.R. 155 (Bankr. D. Me. 1982)............................................... 30

In re Dow Corning Corp., 208 B.R. 661 (Bankr. E.D. Mich., 1997)............................................ 27

In re Eagle-Picher Indus., Inc., 176 B.R. 143 (Bankr. S.D. Ohio 1994)................................. 30, 31

In re Express One Int'l, Inc., 194 B.R. 98 (Bankr. E.D. Tex. 1996) ............................................ 28

In re Geriatrics Nursing Home, Inc., 187 B.R. 128 (D.N.J. 1995) .............................. 2, 17, 26, 31

In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000) ................................... 19, 20

In re Homestead Partners, Ltd., 197 B.R. 706 (Bankr. N.D. Ga 1996) ........................................ 32

In re Interco Inc, 137 B.R. 999 (Bankr. E.D. Mo. 1992)............................................................... 26

In re Monroe Well Service, Inc., 80 B.R. 324 (Bankr. E.D. Pa. 1987) ........................................ 17

Marshall v. Marshall, 547 U.S. 293 (2006) ..................................................................................... 2

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000)........................................................... 22, 23

In re Standard Mill Ltd. P'ship, No. 4-96-2656, 1996 WL 521190 (Bankr. D. Minn. Sept. 12, 1996) ......................................................................................................................... 26

In re Texaco, Inc., 81 B.R. 806 (Bankr. S.D.N.Y. 1988)............................................................... 30

In re Texas Extrusion Corp., 68 B.R. 712 (N.D. Tex. 1986) ......................................................... 30

In re THCR/LP Corp., No. 04-46898 (Bankr. D.N.J. Feb. 23, 2005) ........................ 26, 31, 32, 33

## STATUTES

11 U.S.C. § 1107 ........................................................................................................................... 6

11 U.S.C. § 1108 ........................................................................................................................... 6

11 U.S.C. § 1121 ................................................................................................................... *passim*

11 U.S.C. § 1129 ........................................................................................................................... 6

28 U.S.C. §158(a)(1) ..................................................................................................................... 1

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

Appellants Beal Bank, S.S.B., and Beal Bank Nevada (collectively, "Beal Bank") appeal the order, entered on August 31, 2009 (the "Termination Order") [Bankr. Docket No. 613], of the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), which terminated the Debtors' exclusive period of time in which to file a plan of reorganization and thereby permitted the Ad Hoc Committee of Holders of the Debtors' 8.5% Senior Secured Notes Due 2015 (the "Ad Hoc Committee") to file an alternative, competing plan of reorganization. This Court has jurisdiction to hear Beal Bank's appeal pursuant to 28 U.S.C. §158(a)(1).

## STATEMENT OF THE ISSUES PRESENTED

This is an appeal from the Bankruptcy Court's Termination Order. The Ad Hoc Committee successfully moved the Bankruptcy Court to terminate the Debtors' exclusivity period, in large part, based on the Supreme Court's decision in Bank of America Nat'l Trust and Savs. Ass'n v. 203 North LaSalle Street P'ship, 526 U.S. 434 (1999) (hereinafter "LaSalle"). The ruling is incorrect as a matter of law.  LaSalle addresses objections to plan confirmation, not grounds to terminate exclusivity.  Moreover, the Ad Hoc Committee failed to introduce any evidence to substantiate its incorrect factual assertions that served as the basis for the ruling.

The following issues are presented in this appeal:

- Whether the Bankruptcy Court erred as a matter of law in terminating the Debtors' exclusivity, an extraordinary remedy, based on LaSalle.

- Whether the Bankruptcy Court erred as a matter of law in terminating the Debtors' exclusivity without any evidentiary basis, instead leaving the necessary factual findings to a later date (presumably, a hearing on the confirmation of the Debtors' proposed plan of reorganization).

- Whether the Bankruptcy Court's ruling was clearly erroneous based on the limited record presented.

The Bankruptcy Court made its decision (i) based on the <u>wrong law</u>, (ii) at the <u>wrong time</u> in these chapter 11 cases, and (iii) on the <u>wrong record</u>.  The Termination Order should therefore be reversed.

## STANDARD OF REVIEW

Generally, orders that extend or reduce a debtor's period of exclusivity "will not be set aside absent an abuse of discretion." <u>In re Geriatrics Nursing Home, Inc.</u>, 187 B.R. 128, 131 (D.N.J. 1995). Interpretations of law, however, are reviewed de novo. <u>Marshall v. Marshall</u>, 547 U.S. 293, 303 (2006).  Thus, where a bankruptcy court "rest[s] [its] conclusion as to the issue of terminating the exclusivity period on legal issues, the Court shall engage in <u>plenary review of that determination</u>."  <u>Geriatrics</u>, 187 B.R. at 131 (emphasis added). Stated alternatively, a reviewing court will find an abuse of discretion where a bankruptcy judge "fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." <u>Geriatrics</u>, 187 B.R. at 131 (citing <u>Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.</u>, 50 F.3d 253, 257 (3d Cir. 1995).

Here, the Bankruptcy Court relied on an incorrect reading of <u>LaSalle</u>.  The Bankruptcy Court's determination to terminate exclusivity without making findings likewise raises an issue of law and incorrect procedure.  Consequently, review here is <u>de novo</u>.  Moreover, there was either no, or insufficient, evidence to support the Bankruptcy Court's findings to support a termination of the Debtors' exclusivity, so the ruling was also an abuse of discretion on that basis as well.

## STATEMENT OF THE CASE

### Introduction

This appeal centers on a dispute among an undersecured first lien lender, Beal Bank, and admittedly out-of-the-money second lien noteholders, the Ad Hoc Committee, who unjustifiably

insist on pursuing a scorched earth campaign in an attempt to take over the Debtors' business at the expense of senior creditors and the Debtors' estates.  Stuck in the middle are the Debtors, whose enterprise value remains at risk of eroding the longer this standoff is allowed to persist.

Beal Bank's first priority liens on, and security interests in, substantially all of the Debtors' assets, including cash collateral, have been validated and are beyond dispute. Nevertheless, the Ad Hoc Committee, which, at the time it sought to terminate the Debtors' exclusivity, admitted it was out-of-the-money and had no economic interest in the Debtors' estates, has decided to continue to hold the Debtors and Beal Bank hostage.  Since the inception of these chapter 11 cases, the Debtors have moved quickly and proactively to reorganize themselves effectively.  Moreover, since the Petition Date, the Debtors have relied on the continued use of Beal Bank's cash collateral and continue to do so even through this needlessly extenuated dual plan process erroneously permitted by the Bankruptcy Court.  Further, beginning even before the Petition Date, and with the assistance of their investment bankers, Lazard Frères & Co. LLC ("Lazard"), the Debtors canvassed the universe of potential strategic and financial partners, including all suitable third parties as well as Beal Bank and the members of the Ad Hoc Committee.  The Debtors nonetheless only received serious bids for their recapitalization from Beal Bank and the Ad Hoc Committee.  The bids were reviewed, revised and painstakingly considered by the Debtors.  At the end of the day, the Debtors' Board of Directors accepted Beal Bank's bid as having the greatest prospect of an effective reorganization.  The Debtors accomplished all of this and filed a plan of reorganization during their statutory period of exclusivity, and the Bankruptcy Court even granted a 45-day extension so the Debtors could continue their meaningful reorganization efforts.

Then, with no provocation other than perhaps the soreness associated with being a losing bidder in an otherwise robust auction process, the Ad Hoc Committee decided to try to convince the Bankruptcy Court to terminate the Debtors' recently extended exclusivity in order to unjustifiably insert itself into what has now become a needlessly expensive and burdensome dual plan process.  Without developing a sufficient evidentiary record, and on the misdirected premise that LaSalle somehow applies at this point in this case, the Bankruptcy Court acquiesced.

According to the Ad Hoc Committee's argument to the Bankruptcy Court, the Trumps' participation in the Debtors' casino business post-exit under the Debtors' plan necessitated the termination of exclusivity. Competing plans, the Ad Hoc Committee said quixotically, were needed to permit the Debtors' plan to be confirmable.  To advance its argument, the Ad Hoc Committee mischaracterized the proposed post-exit injection of new equity capital by Beal Bank and the Trumps as a bid to buy the business, slung allegations (it notably chose not to even try to substantiate) that the Debtors' process in getting to their plan was somehow flawed, and enticed the Bankruptcy Court with the promise that the Ad Hoc Committee would pay more – thereby supposedly assuring the estate of a greater recovery.

All of this may have sounded good in a vacuum at the time, but properly put in context, it falls flat.  Obfuscated and unaddressed by the Ad Hoc Committee before the Bankruptcy Court was the fact that the Debtors valued their assets as being worth less than the amount owed to Beal Bank, and, perhaps as importantly, that the Ad Hoc Committee had, at the time, chosen not to dispute the Debtors' valuation.  From this flowed one inescapable conclusion: no stakeholder, other than Beal Bank, held a protectable economic interest in the estate.  As such, whether by way of a plan, a sale of the Debtors' assets or foreclosure, Beal Bank, and only Beal Bank, could be in a position to realize any value attributed to the Debtors' estates.

In seeking to terminate exclusivity, to advance its strategy to acquire the Debtors' business without having to provide material value to the other holders of second lien debt, and later to support cutting-off adequate protection payments to Beal Bank, the Ad Hoc Committee was content to adopt the Debtors' assessment that the Debtors' business is worth less than the amount the Debtors owe to Beal Bank.  Upon the realization that being out-of-the-money could jeopardize their standing to pursue an alternative plan and to force Beal Bank to finance the Ad Hoc Committee's purchase of the business, the Ad Hoc Committee amended its disclosure statement – the document that the Debtors' stakeholders are supposed to rely on as reflecting the Ad Hoc Committee's true beliefs and intentions – to state that Beal Bank is now oversecured – by $14 million.  The last-minute fabrication of an immaterial stake does not cure the Ad Hoc Committee's standing problems or entitle them to continue inflicting injury on Beal Bank and the Debtors' estates in the hopes of levering an unjustified recovery.  Such gamesmanship should find no reward.

A debtor's exclusive right to formulate a plan of reorganization, and solicit votes thereon, is a cornerstone of the chapter 11 process.  Beal Bank respectfully submits that the Bankruptcy Court failed to apply the proper legal standard when terminating this fundamental right of the Debtors.  Moreover, the Bankruptcy Court failed to establish sufficient, identifiable cause justifying the termination of the Debtors' exclusivity.  Accordingly, Beal Bank requests that this Court reverse the Termination Order, thereby restoring the Debtors' statutory right to pursue a single plan process that would permit an expeditious closure to the Debtors' chapter 11 cases.

### Summary of Proceedings Below

On February 17, 2009 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  Since

then, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[1]

On June 16, 2009, the Bankruptcy Court entered an order, pursuant to section 1121(d) and upon the request of the Debtors, extending by forty-five days the period of time within which the Debtors possessed the exclusive right to file a plan of reorganization.  On August 3, 2009, the Debtors properly filed a plan (as amended, restated and/or otherwise modified, the "Debtors' Plan") within the period of exclusivity as established by section 1121(b) and augmented by the Bankruptcy Court pursuant to section 1121(d).  On August 11, 2009, the Ad Hoc Committee moved the Bankruptcy Court to terminate the Debtors' exclusivity, asserting that sufficient "cause" existed under section 1121(d)(1) to do so because (i) the filing of a "new value plan" somehow constitutes per se grounds for termination of exclusivity, (ii) the purported lack of a Debtor-sponsored plan warrants termination of exclusivity notwithstanding the fact that the Debtors had properly filed a plan just eight days before, (iii) the Debtors' Plan allegedly could not meet section 1129 confirmation standards, and (iv) fairness to creditors and the alleged lack of any prejudice to the Debtors supported the termination of exclusivity.

On August 31, 2009, the Bankruptcy Court terminated the Debtors' exclusivity notwithstanding that (i) it premised its decision on the flawed assumption that LaSalle, a case squarely dealing only with plan confirmation issues, applied to a decision to terminate exclusivity, (ii) it focused on issues that unequivocally should have been more appropriately addressed, if at all, at a confirmation hearing, and (iii) it failed to establish an evidentiary record to support its decision to terminate the Debtors exclusivity pursuant to section 1121.

---

[1]        Unless otherwise specified, section references contained herein are to the Bankruptcy Code.

On September 10, 2009, Beal Bank timely appealed the Termination Order, and on September 16, 2009, moved the Bankruptcy Court for a stay of the Termination Order.  On October 7, 2009, the Bankruptcy Court denied the motion to stay the Termination Order.

**Statement of Facts**

As of the Petition Date, many obstacles stood in the way of the present and future viability of the Debtors' casino business, including the need for fresh capital. The Debtors solicited their stakeholders for a solution.  Competing restructuring proposals were submitted to the Debtors by Beal Bank, the estate's first lien lender, and the Ad Hoc Committee, which is comprised of holders of second lien notes (the "Second Lien Notes") issued by the Debtors. Based on Beal Bank's belief that the ongoing and active participation in the business of the Debtors' former celebrity owner, Donald Trump (and his daughter, Ivanka), would maximize its recovery, the Beal Bank proposal was conditioned upon the Trumps' commitment to participate in the restructuring.  In contrast, the Ad Hoc Committee's proposal would have left the Debtors' casinos to compete in an increasingly chaotic and competitive Atlantic City gaming market bereft of their most distinguishing feature, namely the Trump brand.

Following months of negotiations, and after the significant efforts of the Debtors and their advisors, including their investment banker, Lazard, to find a third party investor or purchaser for the Debtors' business failed to garner any offers, the Debtors determined that the Beal Bank proposal was optimal.  On August 3, 2009, the Debtors filed with the Bankruptcy Court the Debtors' Plan, which embodies the terms of Beal Bank's proposal, including, without limitation: (1) continued financing from Beal Bank in the form of a replacement credit facility containing, among other things, an extended maturity through 2020 on below-market terms; (2) a $100 million equity capital investment by Mr. Trump and Beal Bank in exchange for all equity of the reorganized Debtors; and (3) because of the unfortunate deterioration of asset values in

Atlantic City, no distribution to general unsecured creditors, including holders of Second Lien Notes, who were effectively out-of-the-money, even by their own admission.

With exclusivity terminated and now recognizing that it was out-of-the-money, the Ad Hoc Committee put forward a competing plan (as amended, restated and/or otherwise modified, the "AHC Proposed Plan"), which most notably included: (1) a nonconsensual cramdown of Beal Bank's first lien secured debt at below-market terms with only a partial cash pay-down; and (2) issuance of 100% of the new common stock of the reorganized Debtors with (a) 5% to general unsecured creditors (including the members of the Ad Hoc Committee), (b) 75% of new common stock issued to participants in a rights offering, and (c) 20% of the new common stock issued to the "backstop" parties underwriting the rights offering (i.e., the members of the Ad Hoc Committee).  Effectively, the AHC Proposed Plan contemplated that Beal Bank would be crammed down to accept a new credit facility with a significantly reduced face value while the holders of Second Lien Notes and general unsecured creditors would acquire 100% of the equity in the reorganized Debtors.

Concurrently with filing the AHC Proposed Plan, the Ad Hoc Committee also filed a proposed disclosure statement.  Notably, the proposed disclosure statement did not even attempt to establish that holders of Second Lien Notes had any legitimate economic stake in the Debtors' estates that could be protected.  In fact, the Ad Hoc Committee simply adopted the Debtors' own valuation, which, as previously noted, proved that Beal Bank was, in fact, undersecured and that holders of Second Lien Notes had no protectable economic interest in the Debtors' estates.   The Ad Hoc Committee's contentions relied entirely on the mischaracterization of the Beal Bank proposal as a "new value plan" that was not market tested.  The Ad Hoc Committee merely usurped an inapposite line of reasoning from LaSalle – a confirmation case completely

inapplicable to a determination on the termination of a debtor's exclusivity – and tried to bolster its argument with unsubstantiated allegations and innuendo suggesting that the Trumps exerted improper influence upon the Debtors in connection with their solicitation and consideration of restructuring proposals.

Accepting the Ad Hoc Committee's mischaracterization of the circumstances and concluding that market testing of the Debtors' Plan somehow was required subsequent to its timely and proper filing with the Bankruptcy Court because LaSalle might be implicated at confirmation, the Bankruptcy Court took the Ad Hoc Committee's bait and terminated the Debtors' exclusivity.   At a hearing on the Termination Motion on August 27, 2009, the Bankruptcy Court stated the basic facts upon which it relied in reaching its decision to terminate exclusivity as follows:

- the Debtors commenced their chapter 11 cases on the Petition Date;

- the basic capital structure of the Debtors includes approximately $486 million of first lien debt held by Beal Bank and approximately $1.25 billion of Second Lien Notes held, in part, by members of the Ad Hoc Committee;

- the Debtors have calculated the total enterprise value of their business to be approximately $456 million;

- following the Petition Date, the Debtors determined to ask their two main creditor constituencies, Beal Bank and the Ad Hoc Committee, to submit proposed plans for the Debtors' consideration;

- the Debtors' financial advisors, Lazard, also marketed the Debtors' assets, albeit without success;

- the Debtors considered the options presented by both Beal Bank and the Ad Hoc Committee and determined to accept the plan proposed by Beal Bank;

- the Debtors conducted this entire process "fairly expeditiously";

- the plan proposed by Beal Bank envisioned (i) an amended and restated credit agreement to restructure the amounts owed to Beal Bank, with an eight-year extension of the maturity date and a reduced interest rate and (ii) a $100 million

infusion of cash by Beal Bank and Mr. Trump in exchange for 100% of the equity of the Debtors; and

- the plan proposed by the Ad Hoc Committee, at least as filed under seal in connection with the Ad Hoc Committee's motion to terminate exclusivity, envisioned (i) the sale of one of the Debtors' three casinos, the Trump Marina, for $75 million and, (ii) an infusion of $175 million in cash to the Debtors pursuant to a rights offering backstopped by certain members of the Ad Hoc Committee, with the details of such offering not being clear to the Court, and (iii) the payment of cash to Beal Bank and the consummation of an amended and restated credit agreement to restructure the amounts owed to Beal Bank with the same generally below-market terms as proposed under the plan submitted by the Debtors.

(Hr'g Tr., at 85-95, Aug. 27, 2009) (hereinafter "H'rg Tr.").

Importantly, however, the Bankruptcy Court also delineated certain factual issues it either did not or could not resolve based on the record before it.  Specifically, the Bankruptcy Court expressly stated that it did not determine the following factual issues:

- whether the Debtors solicited plan proposals from Mr. Trump himself;

- whether the plan proposed by the Debtors constituted a "new value plan" that "runs afoul" of LaSalle;

- whether there existed any untoward behavior, undue influence, or exertion of improper forces in connection with the Beal Bank's submission of its proposed plan to the Debtors;

- whether Mr. Trump had successfully abandoned the vast majority of his equity interest in the Debtors' prior to the Petition Date;

- whether the plan proposed by the Debtors would be confirmable; or

- whether the plan proposed by the Ad Hoc Committee was better than, or even as good as, the plan proposed by the Debtors.

(H'rg Tr., at 85-95.)   Indeed, the Bankruptcy Court could not have determined these issues on the record before it as it concluded that it would only consider "the matters of public record . . . the nature of the [Debtors'] plan that's proposed, [and] the context in which it was proposed." (H'rg Tr., at 6.)  It would not consider the "factual underpinnings" of the parties' pleadings. (H'rg Tr., at 7.)

Notwithstanding the Bankruptcy Court's failure to resolve these important issues and the lack of an evidentiary record before it, the Bankruptcy Court terminated the Debtors' exclusive right to file and solicit a plan.  In setting forth its reasoning, the Bankruptcy Court recognized that a debtor's "exclusive right under [section] 1121 to propose a plan during the exclusivity period is certainly important and <u>must be safeguarded</u> . . . ."  (H'rg Tr., at 87) (emphasis added). Such right "cannot be disturbed by creditors."  (H'rg Tr., at 87.)  The Bankruptcy Court further recognized that, in seeking to terminate a debtor's exclusive right, "the burden is clearly on the movant to establish the requisite cause under [section] 1121(d)" and, further, "many cases reflect that just because there is a . . . better plan . . . out there, [the existence of such other plan] is not a basis for terminating the exclusivity period."  (H'rg Tr., at 88.)  On this bare record and despite the undisputedly high standard faced by a movant seeking to terminate exclusivity, the Bankruptcy Court entered the Termination Order.

Although not before the Bankruptcy Court at the time it entered the Termination Order, we believe the following actions taken subsequent to the entry of the Termination Order are relevant to this Court's full understanding of the issues at hand in these chapter 11 cases. Following entry of the Termination Order, the Ad Hoc Committee filed its own competing plan of reorganization for the Debtors (as later amended, restated and/or otherwise modified, the "<u>Noteholder Plan</u>") [Bank. Docket No. 616], as well as a proposed disclosure statement relating to the Noteholder Plan (as later amended, restated and/or otherwise modified, the "<u>Noteholder Disclosure Statement</u>") [Bank. Docket No. 617], on August 31, 2009.

On September 23, 2009, the Ad Hoc Committee filed a further amended plan and disclosure statement.  Instead of relying on the Debtors' valuation, this time the Ad Hoc Committee put forth a valuation performed by its own financial advisor, Houlihan Lokey

Howard & Zukin Capital, L.P., which also relied solely upon the Debtors' projections, but now indicated that the Second Lien Notes were in-the-money, by a de minimis amount of approximately $13.9 million.  This Noteholder Plan contemplated: (1) that holders of Second Lien Notes and general unsecured claims would be entitled to receive a pro rata share of 5% of the new common stock of the reorganized Debtors; (2) a capital contribution of $175 million in new equity capital (later increased to $225 million on October 6, 2009), representing 75% of the new common stock of the reorganized Debtors, in the form of a rights offering backstopped by certain members of the Ad Hoc Committee (who would receive 20% of the new common stock of the reorganized Debtors as a backstop fee in consideration for their agreement to provide financing in connection with the Plan); and (3) the possible and highly contingent sale of the Trump Marina for $75 million, less $17 million in deposits. Under  this  amended  Noteholder Plan, Beal Bank would receive (i) the proceeds, if any, from the sale of the Trump Marina, (ii) $75 million of proceeds from the rights offering and new debt at the below market interest rate that Beal Bank determined to be acceptable under the Debtors' Plan.

On September 29, 2009, Beal Bank objected to the amended Noteholder Disclosure Statement on the grounds that, among other things, (i) the feasibility of the Noteholder Plan was premised on the consummation of transactions that were illusory or otherwise unlikely to come to fruition, (ii) the Noteholder Plan forced Beal Bank to finance the Ad Hoc Committee's purchase of the Debtors at below market terms, (iii) the Noteholder Plan provided for a possible distribution to unsecured creditors in violation of the absolute priority rule, and (iv) it lacked certain necessary, material information, including with respect to the inadequacy of the financial projections contained therein.

On October 5, 2009, the Debtors filed an amended Debtors' Plan which, in addition to its original provision for Beal Bank to be paid in full on below-market terms, provided for a direct cash payment by Beal Bank and the Trumps of approximately $13.9 million to holders of Second Lien Notes regardless of whether they are actually entitled to it.   Nevertheless, the Debtors' estates continue to be burdened with the risks and costs associated with a dual plan process and continue to rely on the use of Beal Bank's cash collateral throughout this needlessly complicated and expensive process.

## ARGUMENT

### I.   The Bankruptcy Court Erroneously Relied on <u>LaSalle</u> as the Basis to Terminate the Debtors' Exclusivity

The Bankruptcy Court improperly identified <u>LaSalle</u> as an "important factor" in arriving at its decision to terminate the Debtors' exclusivity because the Debtors' plan "<u>might</u> run afoul of" <u>LaSalle</u>. (H'rg Tr., at 89.) (emphasis added).   In doing so, the Bankruptcy Court mischaracterized <u>LaSalle</u> as follows:

> [O]ld equity submitted a plan to purchase new equity within the exclusivity period of the debtors, and that that plan was rejected by the United States Supreme Court, who underscored the . . . significance and the requirement of market exposure to such a new value plan.   Indeed, there was no specific expression or decision made about the form of that market exposure.   The statement made reflected that it – presumably, it could be a competing plan, or it could be a bidding process.   It did not address whether that bidding process could be held before the plan was submitted.

(Hr'g Tr., at 89-90.)   This reading ignores numerous factors relevant to evaluating the applicability of <u>LaSalle</u> to the present circumstances.

Specifically, the Bankruptcy Court failed to recognize that (i) under <u>LaSalle</u>, the need to properly market the assets of a debtor in connection with a new value plan is a basis for denying confirmation of such plan, <u>not</u> a basis for terminating a debtor's exclusivity, (ii) the potential

applicability of <u>LaSalle</u> at confirmation of a new value plan after a full evidentiary record has been made is <u>not</u> a basis for summarily terminating exclusivity without such evidentiary record, (iii) <u>LaSalle</u> requires a showing that current equity holders abused their exclusive opportunity to control the plan process to obtain a recovery in respect of their interests to the detriment of other legitimate senior interests, not just that insiders will participate in the plan, (iv) <u>LaSalle</u> does not purport to restrict who an in-the-money stakeholder can choose to be its partner in a proposed plan, and (v) <u>LaSalle</u> is inapplicable where the objecting party fails to establish that it has an economic stake in the outcome of a bankruptcy case.

In <u>LaSalle</u>, a bank made a $93 million loan to the debtor secured by a mortgage on part of a Chicago office building, which constituted the debtor's principal asset.  <u>LaSalle</u>, 526 U.S. at 438.  When the debtor defaulted on the loan, the bank commenced foreclosure proceedings.  The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code.  <u>Id.</u>  The debtor's proposed plan called for only previous equity holders to contribute new capital in exchange for all of the equity of the reorganized debtor.  <u>Id.</u> at 440.  The bank objected and its objection prevented the consensual confirmation of the plan.  The debtor thus resorted to a judicial "cramdown" process for imposing the plan on the bank.  <u>Id.</u> at 441.  The cramdown process requires that a plan be "fair and equitable" with respect to the non-consenting creditors in order to be approved.  The bank argued that the plan violated the "absolute priority rule" and, thus, the plan should have been denied.  <u>Id.</u> at 441-42.

The Supreme Court rejected the argument that old equity could exercise exclusive control over the decision to sell the assets of the debtor's estate as part of a chapter 11 plan (to the exclusion of any other party and over the objection of a senior impaired class of creditors) without allowing the proposed plan to be subject to alternative transactions or competing plans.

Id. at 454-58.   Notwithstanding the fact that old equity proposed to provide additional post-petition value to the debtor's estate, the Supreme Court found that the debtor's chapter 11 plan in LaSalle violated the absolute priority rule because old equity retained property "on account of" its pre-petition interests in the debtor, i.e., the old equity retained the exclusive right to propose the chapter 11 plan in the bankruptcy case and thus retained a benefit on account of its old equity.   Id. at 456 (old equity impermissibly retained "a property interest extended 'on account of' the old equity position" by virtue of its "exclusiveness of opportunity [to propose a chapter 11 plan], with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals").

The Supreme Court expressed concern that old equity, acting as the debtor in possession, could use its exclusive right to file a chapter 11 plan to retain part or all of its interest in the debtor without market testing the proposed purchase price:

> Given that the opportunity is property of some value, the question arises why old equity alone should obtain it, not to mention at no cost whatever. . . . If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor . . . Hence, it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection.

Id. at 456 (emphasis added) (internal citations omitted).   As indicated by the emphasized language, the Supreme Court did not dictate (i) the specific method by which the value of an asset should be market tested or (ii) when such market testing should be conducted.

**A.     Under <u>LaSalle</u>, the Failure to Market Assets When a Plan Provides "Old Equity" with the Exclusive Right to Invest New Capital is a Basis for Denying Confirmation of the Plan, <u>not</u> a Basis for Terminating Exclusivity.**

As stated above, the Supreme Court in <u>LaSalle</u> considered whether that debtor's plan could be <u>confirmed</u> given that it constituted a "new value plan." The Supreme Court ultimately held that the debtor's plan could not be confirmed because it violated the absolute priority rule. Nowhere did the Supreme Court mandate that the need to market test a "new value plan" constitutes a basis for terminating a debtor's exclusivity. Rather, as discussed in detail in section II.A. below, sections 1121(b) and (d) indicate who may file a plan and the time period within which only the debtor in possession may file a plan. Accordingly a plan falling within the scope of <u>LaSalle</u> may require denial of confirmation, but it certainly does not necessitate the termination of exclusivity. Thus, the Bankruptcy Court misapplied <u>LaSalle</u> in this case.

Viewed in this context, the Ad Hoc Committee's argument is revealed to be, at its core, an objection to the confirmability of the Debtors' plan under section 1129. Such objections are often raised in the context of disclosure statement hearings, wherein an objecting party will argue that a disclosure statement should not be approved because the underlying plan is patently unconfirmable and solicitation of such plan would therefore be a waste of time and expense. Even when raised in the context of a disclosure statement hearing, such arguments fail in the vast majority of the cases on the basis that those arguments are more properly addressed at a confirmation hearing where a full evidentiary record has been established. <u>See</u>, <u>e.g.</u>, <u>In re Monroe Well Serv., Inc.</u>, 80 B.R. 324, 332-33 (Bankr. E.D. Pa. 1987) (passing on issues relating to confirmation at disclosure statement hearing where no evidence was presented and noting such disclosure statement hearing should not be converted into a confirmation hearing to "insure that due process concerns are protected"); <u>In re Cardinal Congregate I</u>, 121 B.R. 760, 764

(Bankr. S.D. Ohio 1990) (declining to consider issues relating to confirmation at hearing on adequacy of disclosure statement).

      **B.**    **The Potential Applicability of <u>LaSalle</u> at a Confirmation Hearing After a Full Evidentiary Record has been Made is not a Basis for Terminating Exclusivity Without the Existence of Any Such Evidentiary Record.**

In addition, <u>LaSalle's</u> application is limited to confirmation of a "new value plan" after a full evidentiary record has been established.  A court is thus required to make certain findings of fact and reach certain legal conclusions in order to determine that a plan violates the absolute priority rule in the manner described in <u>LaSalle</u>.  In addition, a movant seeking to terminate exclusivity bears the burden of proof.  <u>Geriatrics</u>, 187 B.R. at 132.  Here, the absence of a full evidentiary record makes it impossible for a court to even make the necessary findings of fact to conclude that a plan implicates <u>LaSalle</u> and therefore requires market testing.

In this instance, after urging the Bankruptcy Court to base its decision on <u>LaSalle</u>, the Ad Hoc Committee chose not to present any evidence to meet its burden of proof.  (H'rg Tr., at 6.)  The Bankruptcy Court, relying on the Ad Hoc Committee's flawed strategy, stated that it would <u>only</u> consider "the matters of public record . . . the nature of the [Debtors'] plan that's proposed, [and] the context in which it was proposed."  (H'rg Tr., at 6.)  It would <u>not</u> consider the "factual underpinnings" of the parties' pleadings.  (H'rg Tr., at 7.)  The Bankruptcy Court's ruling, therefore, which was based on a non-existent evidentiary record, is clearly erroneous.

      **C.**    **The Bankruptcy Court Erroneously Applied <u>LaSalle</u> Without Determining (i) Whether Mr. Trump Exerted Any Control Over the Debtors' Estates During the Plan Process and (ii) Whether Mr. Trump Held Any Equity Interest in the Debtors as of the Petition Date.**

Despite the Bankruptcy Court's concern that the Debtors' Plan "<u>might</u> run afoul of" <u>LaSalle</u>,  (H'rg Tr., at 89) (emphasis added), the Bankruptcy Court could not even determine whether the Debtors' Plan actually <u>did</u> run afoul of <u>LaSalle</u> because the Bankruptcy Court did

not determine (i) whether there was "anything untoward that happened, any undue influence, any exertion of improper forces in connection with the submission" of the Debtors' Plan, or (ii) whether Mr. Trump successfully abandoned his equity interest in the Debtors prior to the Petition Date.  (H'rg Tr., at 89.)  In fact, the Bankruptcy Court appears to base its opinion that the Debtors' Plan "might" fall within the ambit of LaSalle solely on its belief that (i) Mr. Trump served on TER's board of directors and held a substantial, but not controlling, portion of TER's stock until four days prior to the Petition Date, and (ii) Mr. Trump is the sole owner of ACE Entertainment Holdings, Inc., which itself is a non-Debtor entity that owns less that 0.01% of TER Holdings.  (H'rg Tr., at 89.)

For LaSalle to apply, one must demonstrate not only (i) that an equity holder receives a tangible benefit under one plan that it might not have received under another plan, but also (ii) that such equity holder controlled the plan process in some fashion through a controlling equity position.  The decision of In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000), is instructive on this last point.  In Global Ocean, the United States Bankruptcy Court for the District of Delaware interpreted LaSalle and refused to confirm a chapter 11 plan that contemplated the transfer of 100% of the equity in the reorganized estates to a third-party company (owned by the controlling shareholder's daughter), while a class of senior unsecured creditors received only a 50% recovery.  Global Ocean, 251 B.R. at 34-36 .  In response to the objection of certain impaired unsecured creditors, the debtors argued that the plan complied with LaSalle so long as old equity itself did not actually retain any estate property on account of its prepetition interests.  Id. at 48. The bankruptcy court, however, rejected the debtor's narrow interpretation, pointing out that the Supreme Court's main concern in LaSalle was old equity's exclusive control over the sale and purchase price of the debtor's assets:

> In the <u>LaSalle</u> decision, the Supreme Court concluded that the absolute priority rule was violated where the debtor's plan permitted only its shareholders to invest new capital to obtain all the equity in the company. The Court was particularly concerned by the fact that the debtor had retained the exclusive right to propose a plan, thereby precluding others (including the objecting creditor) from proposing a plan 'selling' the equity to another. The Court stated: 'Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended "on account of" the old equity position and therefore subject to an unpaid senior creditor class's objection.' . . . In <u>LaSalle</u>, the 'opportunity' which the Supreme Court found was given to the existing shareholders was the *exclusive* right to bid on the equity in the debtor.

<u>Id.</u> at 49 (quoting <u>LaSalle</u>, 526 U.S. at 456) (emphasis in original). Accordingly, the court found that the debtor's proposed chapter 11 plan was unconfirmable under the reasoning of <u>LaSalle</u> because the majority shareholder, through his control over the debtor, "retained his *exclusive* right, to *determine* who [would] be the owner of [the debtor] (as well as the price [such owner would] pay for ownership)." <u>Global Ocean</u>, 251 B.R. at 49 (emphasis in original).

In this case, the Bankruptcy Court failed to recognize the key difference between the instant case and the cases that find that a "new value plan" must be subject to market testing. Namely, Mr. Trump did not possess control in any way over the Debtors or the manner in which they conducted their market testing efforts to find an optimal recapitalization plan. Prior to the Peition Date, Mr. Trump resigned from the Debtors' Board of Directors and, even when he was on the Board, the majority of directors were independent. Moreover, as stated on the record by counsel to both Mr. Trump and the Debtors, pursuant to the corporate governance documents ancillary to the plan of reorganization consummated by the Debtors in connection with a prior bankruptcy, holders of Second Lien Notes designated at least five directors on the Board. (Trump Obj. ¶ 2 [Bankr. Docket 557]; Debtors Obj. ¶ 4 [Bankr. Docket 563]). At the time the

Bankruptcy Court entered the Termination Order, the six members of the Debtor's Board included three directors designated by Noteholders, one member mutually appointed by the Noteholders and Mr. Trump, and the CEO, Mr. Juliano, who was selected by the Noteholder-designee dominated Board and added to the Board by the Noteholders. (Trump Obj. ¶ 2.) Thus, the Debtors were not controlled by Mr. Trump and the Board was controlled by directors largely selected by holders of Second Lien Notes.

Further, as the Bankruptcy Court failed to determine whether Mr. Trump successfully abandoned his equity interest in the Debtors prior to the Petition Date, it was not even demonstrated that Mr. Trump constitutes "old equity" for the purpose of conducting a <u>LaSalle</u> analysis. These assertions went unchallenged by the Ad Hoc Committee and the Bankruptcy Court. In fact, adoption of the Bankruptcy Court's approach on this issue would mandate terminating exclusivity every time a debtor considered a plan that included any money from an existing equity holder. The <u>LaSalle</u> court specifically rejected the notion that "Congress would have desired to exclude prior equity categorically from the class of potential owners following a cram down." <u>LaSalle</u>, 526 U.S. at 1421. Yet, terminating exclusivity based on the involvement of any old holder of old equity, no matter how small, would have the same effect. Debtors will not risk losing exclusivity based on the involvement of an equity holder, again regardless of how small. And eliminating, or at least frustrating, the involvement of equity holders that do not control the process will chill reorganizations. That consequence would be very serious as "equity may well be in the best position to make a go of the reorganized enterprise and so may be the party most likely to work out an equity-for-value reorganization." <u>Id.</u> at 1421. The Ad Hoc Committee has not cited, and research has not disclosed, any case in which exclusivity was terminated based on the involvement of a non-controlling equity holder or where there was a

marketing effort.  To the contrary, the courts have routinely permitted such plans to proceed with the benefit of ongoing exclusivity.  That the Debtors' Plan "might" constitute a new value plan and thereby "run afoul" of LaSalle, is not a sufficient basis for terminating exclusivity, and such conclusion cannot even be substantiated due to the lack of an evidentiary record created before the Bankruptcy Court.

     **D.**       **LaSalle, When and to the Extent Applicable, Requires that Assets be Exposed to Market Testing, not that Market Testing Occur After a Deal has been Struck.**

Even if LaSalle mandated market testing of the Debtors' Plan in this instance, such exhaustive market testing undoubtedly occurred prior to the Debtors' filing of their plan.  The record is replete with support that the Debtors ran an open and competitive process whereby the Debtors solicited bids from both Beal Bank and the Ad Hoc Committee itself.  (H'rg Tr., at 85-86.)  In addition, the Debtors' financial advisor, Lazard, actively marketed the Debtors' casino properties to potential third party strategic and financial investors who were unconnected with the Debtors' current affairs.  (H'rg Tr., at 86.)  None of those parties submitted a bid.  (H'rg Tr., at 86.)  Upon consideration of the proposals from Beal Bank and the Ad Hoc Committee, the Debtors selected Beal Bank's proposal.  (H'rg Tr., at 86.)  Accordingly, the Bankruptcy Court was well aware that the Debtors ran a successful auction to obtain the best and most viable bid for a successful plan of reorganization.

Here, the competitive bidding process run by the Debtors and Lazard confirms that the bid value was sufficiently tested.  As the Third Circuit explained in In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000), "[w]hat doomed the plan in 203 North LaSalle was not that old equity received property under the plan, but the 'exclusivity' that old equity enjoyed, which suggested that old equity might have obtained the interest for less than someone else might have paid." 228 F.3d at 239-40.  As the Bankruptcy Court recognized, neither Beal Bank nor Mr.

Trump enjoyed exclusivity in pricing new equity under the Debtors' Plan. (See H'rg Tr., at 86.) Further, the Bankruptcy Court's recognition that the Ad Hoc Committee participated in the process confirms that the price was not set exclusively by Beal Bank or Mr. Trump. See PWS, 228 F.3d at 239 ("[noteholder] made several offers for the claims, which were considered and rejected, demonstrating that [debtor] enjoyed no exclusivity of opportunity). The fact that the Ad Hoc Committee's lower bid was not selected merely reflects its shortcomings as a value proposition. To now give the Ad Hoc Committee a second bite at the apple runs afoul of Third Circuit precedent and disregards LaSalle to the extent it is even applicable in this case.

### E. LaSalle Does not Restrict Who an In-the-Money Stakeholder, Such as Beal Bank, Can Choose to be Its Business Partner in a Plan of Reorganization.

The circumstances in LaSalle fundamentally differ from those in the present case. In LaSalle, the Supreme Court sought to prevent equity holders from receiving value "on account of" their equity interests before a senior stakeholder recovered in full. See PWS, 228 F.3d at 238. Specifically, in LaSalle, "[t]he Court rejected arguments that 'on account of' means 'in satisfaction of' the interest or 'in exchange for' the interest and concluded that it means 'because of' the interest." Id. Accordingly, it is a "causal connection between holding the prior claim or interest, and receiving or retaining property, [that] will trigger the absolute priority rule." Id. In the instant case, Mr. Trump is not receiving the right to participate in the Debtors' Plan as a result of his prior equity interest in the Debtors. Rather, he is receiving such right because both the Debtors and Beal Bank determined that the Debtors' reorganized business will be more valuable with Mr. Trump's continued participation and substantial equity capital investment.

The Ad Hoc Committee would have this Court believe that the law should view the Debtors' Plan differently because Mr. Trump constitutes a financier of such plan rather than, for instance, Steven Wynn. Such a holding would have the perverse effect of encouraging the

Debtors to propose a plan in which Mr. Trump does not participate notwithstanding the fact that the Debtors believe Mr. Trump's participation – personally and financially – to be in the best interests of their estates.  Even if applicable, <u>LaSalle</u> does not prohibit this.

>    **F.**     **<u>LaSalle</u> is Inapplicable Where, as Here, the Objector Fails to Establish that it has a Protectable Economic Stake in the Outcome.**

As a final matter, <u>LaSalle</u> is inapplicable in the instant case where, as of the date the Bankruptcy Court entered the Termination Order, no party, including the Ad Hoc Committee, contested the valuation provided in the Debtors' Disclosure Statement, which clearly demonstrated that holders of Second Lien Notes are out-of-the-money.  If its members were out-of-the-money, as the Ad Hoc Committee conceded at the time, there would be little reason for the Ad Hoc Committee to pursue its own plan except to extract hold-up value.  Indeed, the Ad Hoc Committee simply seeks to leverage a payout here by submitting a competing plan.

The Ad Hoc Committee agreed at the time that the value of the estate is less than the senior claims of Beal Bank. Consequently, the Ad Hoc Committee acknowledged that it has no right to any distribution and, accordingly, is motivated to lever a settlement through the proposed dissipation of the secured assets to provide its members with monies as to which they have no entitlement. In fact, during the hearing, the Ad Hoc Committee noted that its members are "receiving nothing" and referenced another case in which exclusivity was lifted and "lo and behold there was as a settlement." (Hr'g Tr. At 18, 21.)  The other supporters of the disruption of this case also candidly admit they want to terminate exclusivity because it "can do nothing but foster better recoveries and perhaps a negotiation," claiming "the purpose of the bankruptcy is to foster the best recovery for all creditors, not Mr. Trump and Beal Bank alone." (<u>Id.</u> at 28, 29, <u>see also</u> at 95.)  The Court seemed to agree in stating "when you're talking about receiving nothing from the plan, that's - quite a club." (<u>Id.</u> at 79.)  But as the Ad Hoc Committee admitted, the

value of the estate is less than the senior claims, so they are entitled to nothing. The Ad Hoc Committee should not be permitted to try to extort a payment from Beal Bank, the only true holder of an economic interest in the estates by disrupting the Debtors' plan and bankruptcy.

II.     **The Bankruptcy Court Erred Because the Ad Hoc Committee Did Not Satisfy the "Especially Heavy" Burden Required to Terminate the Debtors' Period of Exclusivity**

A.     **The Bankruptcy Court Erred by Applying a Lesser Burden of Proof in View of the Debtors' Previously Obtained a 45-Day Extension of Exclusivity.**

Section 1121(b) of the Bankruptcy Code provides that in the first 120 days after the commencement of a chapter 11 case, a debtor has the exclusive right to file a plan of reorganization. 11 U.S.C. § 1121(b). This is not only mandated by statute, but also by sound public policy as the period of exclusivity affords a debtor the opportunity to propose and seek support for its plan without interference from its creditors' or other interested parties' competing plans. Geriatrics, 187 B.R. 128, 131 (D.N.J. 1995).

Additionally, section 1121(d) of the Bankruptcy Code permits the Court to extend or reduce the period of exclusivity "for cause" upon request of a party in interest after notice and hearing. 11 U.S.C. § 1121(d). The Bankruptcy Code does not define "cause" for purposes of section 1121(d) nor does it establish any formal criteria for termination of periods of exclusivity. In re Burns & Roe Enters., Inc., No. 0041610, 2005 WL 6289213 at *3 (Bankr. D.N.J. Nov. 2, 2005). Still, the statutes and case law make clear that an order terminating exclusivity is an uncommon relief only to be exercised in certain narrow circumstances. In fact, courts in this district have described termination of a debtor's exclusive periods as "dramatic relief." (Transcript of Hearing at 31, In re THCR/LP Corp., No. 04-46898 (Bankr. D.N.J. Feb. 23, 2005). Because termination of periods of exclusivity represents extraordinary relief, a party seeking to terminate exclusivity bears a "heavy burden." Geriatrics, 187 B.R. at 132 (internal citations

omitted); <u>In re Standard Mill Ltd. P'ship</u>, No. 4-96-2656, 1996 WL 521190, at *1 (Bankr. D. Minn. Sept. 12, 1996); <u>In re Interco Inc</u>, 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992).

In its discussion of the burden of proof to be applied when evaluating whether to terminate a debtor's period of exclusivity, the Bankruptcy Court erroneously relied on a decision from the United States Bankruptcy Court for the Eastern District of Michigan to support the assertion that "if there has been [an] extension, that the burden is reduced, the burden to pierce that exclusivity and terminate it."  (H'rg Tr., at 67-68.)  Thus, the Bankruptcy Court concluded that, even though the Debtors' chapter 11 cases have "gone forward fairly expeditiously . . . there is authority for the proposition that as you depart from the 12[0]-day exclusivity period, there is a lesser burden down the road."  (H'rg Tr., at 92-93.)

The authority that the Bankruptcy Court was referring to is <u>In re Dow Corning Corp.</u>, 208 B.R. 661 (Bankr. E.D. Mich., 1997).  <u>Dow</u> involved a debtor who was given more than one extension, lasting for more than two years, yet still exclusivity was not terminated.  Further, the court in <u>Dow</u> unequivocally stated that while passage of time is a changed circumstance to be considered in evaluating the merits of a motion to terminate exclusivity, "it is not sufficient in and of itself to be cause to terminate exclusivity."  <u>Id.</u> at 664.

The court in <u>Dow</u> ultimately held that exclusivity should not be terminated and, in reaching this holding, discussed each of the eight factors discussed below and found that, collectively, those factors weighed slightly in favor of the debtor.  <u>Id.</u> at 669. In this case, the Bankruptcy Court did not engage in such a searching review, instead relying on dicta from <u>Dow</u> to conclude that the burden the Ad Hoc Committee had to meet to terminate exclusivity was reduced. Absent clearer language to support this assertion, the Bankruptcy Court erred in

concluding that the Ad Hoc Committee's burden to terminate exclusivity was reduced in these circumstances.

**B.      The Bankruptcy Court Erred in Finding that the Ad Hoc Committee had Demonstrated Sufficient Cause to Terminate Exclusivity.**

Courts in the Third Circuit and elsewhere have acknowledged that the following non-exhaustive list of factors are instructive in evaluating a request to extend or modify periods of exclusivity:

- the size and intricacies of the case;

- the necessity of an adequate amount of time to permit the debtor to negotiate a reorganization plan and gather sufficient information;

- the existence of good faith progress toward post-bankruptcy reorganization;

- the debtor's continuing payment of its post-petition obligations as they come due;

- whether the debtor has shown reasonable prospects of filing a viable plan;

- whether the debtor has made progress in negotiations with its creditors;

- the amount of time that has already gone by in the case; and

- whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands.

See In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); In re Adelphia Commc'ns Corp., 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006); In re Express One Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).  None of these factors support either the Ad Hoc Committee or the decision of the Bankruptcy Court to terminate exclusivity.

Simply put, the Ad Hoc Committee failed to meet its heavy burden.  The Ad Hoc Committee disregarded the factors listed above and made no attempt to explain how any of these factors supported the termination of exclusivity.   Perhaps this oversight was a tacit acknowledgement that each of the factors listed above actually weighs in favor of maintaining

the Debtors' period of exclusivity.  First, the Debtors' cases are quite large and complex, involving a number of entities that operate three large casinos with thousands of employees. Second, the Debtors, in fact, timely filed a reorganization plan, which was the result of broad, arm's-length negotiations with representatives of the Ad Hoc Committee, Beal Bank and Mr. Trump.  Third, the Debtors have worked diligently, without undue delay and in good faith, to evaluate viable restructuring alternatives proposed by the Ad Hoc Committee and by Beal Bank, and to document the complex set of restructuring transactions upon which the Debtors' plan is predicated.  The Debtors' plan was filed within six months of the Petition Date and presents the Debtors with the possibility of exiting chapter 11 prior to the end of this year – a significant accomplishment in light of the state of the Atlantic City gaming market and the circumstances which led to the chapter 11 filing in the first place.  Finally, the Debtors are not using exclusivity to pressure creditors into accepting the Debtors' demands.  Holders of Second Lien Notes are not voting on the Debtors' plan and will receive no distribution pursuant to the Debtors' plan. Consistent with the enterprise valuation prepared by the Debtors' financial advisor, the Debtors have proposed a plan which does not rely on support from out-of-the-money creditor constituencies.  Accordingly, there are no creditors that are being pressured, merely creditors who are disappointed with the enterprise valuation that underlies the Debtors' plan, an enterprise valuation that the Ad Hoc Committee itself adopted at the time.

Further, although courts have commonly relied on the factors above in deciding whether to *extend* the exclusivity period, there are additional, more specific factors used in evaluating whether cause exists to *terminate* exclusivity.  Courts have examined whether certain facts presented show that the debtor has (i) delayed in filing a plan, In re Eagle-Picher Indus., Inc., 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994), (ii) grossly mismanaged its operations, In re Crescent

Beach Inn, Inc., 22 B.R. 155, 159 (Bankr. D. Me. 1982), (iii) used the exclusivity period to compel creditors to accede to an unacceptable plan, In re Texaco, Inc., 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988), or whether (iv) acrimony exists among the debtor's principals, In re Texas Extrusion Corp., 68 B.R. 712, 725 (N.D. Tex. 1986).  In effect, courts look to see whether the debtor is taking advantage of the process or is otherwise dysfunctional in its attempts to craft a reorganization plan.

In addition to its failure to offer any analysis of the general factors outlined above, here, too, the Ad Hoc Committee likewise failed to establish any facts that could support a finding of gross mismanagement, domineering or rancorous conduct by the debtors, delay in filing a plan, or any other factors that could be construed as cause to terminate exclusivity.  What is left is the bare fact that the Ad Hoc Committee, which was included in the process of formulating the Debtors' proposed plan, is basically forlorn that its proposal was not the one chosen by the Debtors.  Still, as courts have consistently held, a creditor's dissatisfaction with a particular proposed reorganization plan just does not amount to "cause" for the purposes of terminating exclusivity.

A creditor's desire to file a competing plan does not in itself constitute "cause" for purposes of terminating exclusivity pursuant to section 1121(d).  Indeed, terminating exclusivity on such grounds can constitute an abuse of discretion.  See, e.g., Geriatrics, 187 B.R. at 133-34 (holding that it was an abuse of discretion for the bankruptcy court to terminate exclusivity based on the argument that a competing plan process would promote a better plan of reorganization); Eagle-Pitcher, 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994) (holding after considering movant's allegations "that it has been treated unfairly . . . and . . . that the filing of a competing plan will expedite the prompt resolution of these bankruptcy cases, this court is unable to find the cause

required by [section] 1121(d)").   If the existence of an allegedly superior plan amounts to
"cause" for terminating exclusivity, the Debtors' exclusive privilege to maintain control of the
plan process for up to eighteen (18) months is effectively meaningless.   Should this Court allow
the Bankruptcy Court's ruling to stand, disappointed creditors and prospective investors could
turn chapter 11 cases into free-for-alls by proposing completing plans that would strip Debtors of
the opportunity to seek confirmation of reorganization plans free from the interference of
competing plan proponents.

        The Bankruptcy Court's ruling in the THCR/LP chapter 11 cases is also relevant to the
current cases.   Denial of the request to terminate exclusivity gave the debtors the first chance to
confirm a plan notwithstanding the likelihood of a contested confirmation process and the
possibility that the debtors' plan would not be confirmed. (Tr. of Hr'g at 110-11, In re THCR/LP
Corp., Case No. 04-46898 (Bankr. D.N.J. Feb. 23, 2005)).   The Bankruptcy Court noted that the
possibility that the debtors' plan might not be confirmed or that a better plan existed did not rise
to the level of "cause" as these possibilities are present in every case where a plan proposed by a
debtor during its exclusive periods is later not confirmed:

> [T]he fact that there may be other options, that there may be a
> better plan, that if we get to confirmation and the confirmation of
> the plan is denied, that we will be at square one and will have to
> understand the direction to pursue in terms of how to reorganize
> the debtors, all of that is understood and all of that occurs in every
> case, if the plan proposed by a debtor during exclusivity is not
> confirmed.

Id.; see also Adelphia 352 B.R. at 587 ("I note that displeasure with a plan on file is not a basis
for terminating exclusivity.  Nor, without more, is creditor constituency unhappiness with a
debtor's plan proposals, with or without a formal plan on file.")

        Although the Ad Hoc Committee maintained that confirmation issues should not be
addressed in connection with the request to terminate exclusivity, it nevertheless raised a laundry

list of confirmation and disclosure issues in its Motion to Terminate Exclusivity. (Motion ¶¶ 34-35.)  There is no dispute that the appropriate time for the Ad Hoc Committee to address their own absolute priority issues is at plan confirmation.  See In re Homestead Partners, Ltd., 197 B.R. 706, 719 (Bankr. N.D. Ga 1996) (holding that whether a "new value" plan violated the absolute priority rule should be determined at confirmation).  This also appears to have been the view of the Bankruptcy Court at some point.  See Tr. of Hr'g at 107-111, THCR/LP, No. 04-46898 (stating that the proper time to address issues such as good faith, allegations of insider deals, and market exposure is at confirmation).  In THCR/LP, the Bankruptcy Court refused to terminate exclusivity after allegations were made that a proposed plan was a "new value" plan, instead holding that "where the debtor presents a prompt and comprehensive plan that has some support, that is not unconfirmable on its face, I'm not ready to say that the plan is unconfirmable on its face . . . ."  Id. at 110.   Instead, the Court held that it would address whether the absolute priority rule had been violated at the confirmation hearing after all of the facts regarding the pre-petition marketing process had been revealed.  Id.  The same approach should have been applied by the Bankruptcy Court in the instant cases. Confirmation issues should be addressed at confirmation with the benefit of a fully developed evidentiary record. Contrary to the Bankruptcy Court's holding, the existence of such issues does not constitute a basis for "cause" when terminating a debtor's exclusivity, pursuant to section 1121.

## CONCLUSION

For the foregoing reasons, Beal Bank respectfully requests that this Court reverse the Bankruptcy Court's Termination Order and such other and further relief as this court deems proper and justified.

Respectfully submitted,

**TEICH GROH**
By: /s/ Brian W. Hofmeister
Brian W. Hofmeister
691 State Highway 33
Trenton, NJ 08619
Telephone: (609) 890-1500
Facsimile:  (609) 890-6961
E-mail: bhofmeister@teichgroh.com


**WHITE & CASE LLP**
Thomas E Lauria
Glenn M. Kurtz
Gerard H. Uzzi
Andrew C. Ambruoso
Eric K. Stodola
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email: tlauria@whitecase.com
Email: tlauria@whitecase.com
Email: gkurtz@whitecase.com
Email: guzzi@whitecase.com
Email: andrew.ambruoso@whitecase.com
Email: estodola@whitecase.com


*Counsel for Beal Bank, S.S.B., and Beal Bank Nevada*

Dated: October 23, 2009