**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen (KR 4963)
Jeffrey D. Prol (JP 7454)
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400
Email: krosen@lowenstein.com
       jprol@lowenstein.com

*-and-*

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen (KH 4679)
James L. Bernard (JB 4273)
Jennifer C. Arnett (JA 6161)
180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-5400
Facsimile:  (212) 806-6006
Email: khansen@stroock.com
       jbernard@stroock.com
       jarnett@stroock.com

*Co-Counsel to the Appellees,*
*The Ad Hoc Committee of Holders of 8.5% Senior Secured Notes Due 2015*

| | |
|---|---|
| In re:<br><br>TCI 2 HOLDINGS LLC, et al.<br><br>         Debtors. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE RENEE M. BUMB<br>CASE NO. 1:09-CV-5137 (RMB) |
| BEAL BANK S.S.B. and BEAL BANK NEVADA,<br><br>         Appellants,<br>v.<br><br>THE AD HOC COMMITTEE OF HOLDERS OF 8.5% SENIOR SECURED NOTES DUE 2015, et al.<br><br>         Appellees. | Sat Below:<br>Honorable Judith H. Wizmur<br>Case No. 09-13654 (JHW)<br>Chapter 11<br><br>(Jointly Administered) |

## BRIEF OF APPELLEES THE AD HOC COMMITTEE OF HOLDERS OF 8.5% SENIOR SECURED NOTES DUE 2015

# <u>TABLE OF CONTENTS</u>

Page No.

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ............................................1

STATEMENT OF THE ISSUES PRESENTED AND  APPLICABLE STANDARD OF
APPELLATE REVIEW ..............................................................................................................1

STATEMENT OF THE CASE .....................................................................................................3

      A.      Nature of the Case .............................................................................................3

      B.      Course of the Proceedings ...............................................................................7

      C.      Statement of the Facts .....................................................................................10

ARGUMENT ..............................................................................................................................16

POINT I:
THE BANKRUPTCY COURT'S RELIANCE ON LASALLE WAS
ENTIRELY APPROPRIATE .....................................................................................................17

      A.      The Bankruptcy Court Properly Relied Upon LaSalle  As a
              Significant, but Not Exclusive, Factor in Terminating the
              Debtors' Period of Exclusivity .......................................................................17

      B.      LaSalle Applies to Donald Trump, an Old  Equity Holder,
              an Insider and a Junior Creditor ......................................................................21

      C.      The Insider Plan Has Not Been Exposed to the Market ........................................23

      D.      Members of the Ad Hoc Committee Have a  Large
              Economic Stake in the Outcome of This Bankruptcy Case –
              To the Tune of $1.25 Billion ...........................................................................25

POINT II:
FACTORS OTHER THAN LASALLE MADE THE TERMINATION OF EXCLUSIVITY
APPROPRIATE ..........................................................................................................................27

POINT III:
THE RECORD BEFORE THE BANKRUPTCY COURT CONTAINED  AMPLE EVIDENCE
FOR THE EXCLUSIVITY DETERMINATION .......................................................................29

CONCLUSION ...........................................................................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Tissue, Inc. v. Donaldson Lufkin & Jennette Securities Corp.*,
    351 F. Supp. 2d 79 (S.D.N.Y. 2004)..........................................................................30

*Bank of America National Trust and Savings Association v. 203 North LaSalle Street
    Partnership*,
    526 U.S. 434 (1999)....................................................................................... passim

*Donald M. Durkin Contracting, Inc. v. City of Newark*,
    No. CVIA 04-163 (GMS), 2006 WL 2724882 (D. Del. Sept. 22, 2006).................................30

*In re Adelphia Communications Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006)......................................................................24

*In re Adelphia Communications Corp.*,
    371 B.R. 660 (S.D.N.Y. 2007), *aff'd* 544 F.3d 420 (2d Cir. 2008) ....................................2, 11

*In re Burns & Roe Enterprises, Inc.*,
    No. 00-41610, 2005 WL 6289213 (D.N.J. Nov. 2, 2005) ........................................................2

*In re Central Jersey Airport Services, LLC*,
    282 B.R. 176 (Bankr. D.N.J. 2002) ......................................................................27

*In re CGE Shattuck, LLC*,
    Case No. 99-12287, 1999 Bankr. LEXIS 1880 (Bankr. D.N.H. Dec. 20, 1999)....................24

*In re Curry Corp.*,
    148 B.R. 754 (Bankr. S.D.N.Y. 1992) ..................................................................28

*In re Davis*,
    262 B.R. 791 (Bankr. D. Ariz. 2001).......................................................................6

*In re Geriatrics Nursing Home, Inc.*,
    187 B.R. 128 (D.N.J. 1995) ...........................................................................2, 19

*In re Global Ocean Carriers, Ltd.*,
    251 B.R. 31 (Bankr. D. Del. 2000) .....................................................................18, 22

*In re Hoffinger Industries, Inc.*,
    292 B.R. 639 (B.A.P. 8th Cir. 2003).........................................................................2

*In re Lake in the Woods*,
    10 B.R. 338 (E.D. Mich. 1981)...........................................................................28

*In re McLean Industries, Inc.*,
   87 B.R. 830 (Bankr. S.D.N.Y. 1987) ...................................................................28

*In re MJ Metal Products, Inc.*,
   292 B.R. 702 (Bankr. D. Wyo. 2003) ............................................................22, 24

*In re Pliant Corp.*,
   Case No. 09-10443 (Bankr. D. Del. June 29, 2009) ......................................5, 18, 28

*In re Public Service Co. of New Hampshire*,
   88 B.R. 521 (Bankr. D.N.H. 1988) ......................................................................28

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000).................................................................................22

*In re R.G. Pharmacy, Inc.*,
   374 B.R. 484 (Bankr. D. Conn. 2007) .................................................................28

*In re Situation Management Systems*,
   252 B.R. 859 (Bankr. D. Mass 2000) ..........................................................5, 18, 19

*In re SM 104 Ltd.*,
   160 B.R. 202 (Bankr. S.D. Fla. 1993) .................................................................19

*In re THCR/LP Corp.*,
   Case No. 04-46898 (Bankr. D.N.J. 2005).............................................................20

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
   322 F.3d 147 (2d Cir. 2003)................................................................................30

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)................................................................................30

*Toibb v. Radloff*,
   501 U.S. 157 (1991)...........................................................................................27


STATUTES

11 U.S.C. § 1121(b) ..................................................................................................1

11 U.S.C. § 1121(d) ..............................................................................................1, 25

11 U.S.C. § 1129(b)(2)(B)(i) ...................................................................................17

11 U.S.C. § 1129(b)(2)(B)(ii) ..................................................................................17

28 U.S.C. § 158(a)(2)............................................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 8013...........................................................................................................2

Fed. R. Evid. 201(b)............................................................................................................30

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction, pursuant to 28 U.S.C. § 158(a)(2), to hear the appeal of Beal

Bank, S.S.B., and Beal Bank Nevada (together, "Beal Bank") from the Bankruptcy Court's

August 31, 2009 Order ("Exclusivity Order") [D.I. 613] granting the emergency motion of the ad

hoc committee (the "Ad Hoc Committee") of certain holders of the 8.5% Senior Secured Notes

Due 2015 (the "Senior Secured Notes") issued by Trump Entertainment Resorts Holdings, L.P.

("TER Holdings") and Trump Entertainment Resorts Funding, Inc. (together with TER Holdings

and the above-captioned debtors and debtors-in-possession, the "Debtors") for an order (a)

terminating the Debtors'[1] exclusive periods in which to file a plan of reorganization and solicit

acceptances thereto, and (b) adjourning the hearing to approve the Debtors' Disclosure Statement

for Debtors' Joint Plan of Reorganization ("Motion to Terminate").[2]

## STATEMENT OF THE ISSUES PRESENTED AND
## APPLICABLE STANDARD OF APPELLATE REVIEW

The issue to be considered on this appeal is whether the Bankruptcy Court's well-

considered termination of the Debtors' period of exclusivity to file a plan of reorganization,

pursuant to 11 U.S.C. § 1121(d)(1), was an abuse of discretion.[3]  The Bankruptcy Court

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  TCI 2 Holdings, LLC (0526); Trump Entertainment Resorts, Inc. (8402); Trump Entertainment Resorts Holdings, L.P. (8407); Trump Entertainment Resorts Funding, Inc. (8405); Trump Entertainment Resorts Development Company, LLC (2230); Trump Taj Mahal Associates, LLC, d/b/a Trump Taj Mahal Casino Resort (6368); Trump Plaza Associates, LLC, d/b/a Trump Plaza Hotel and Casino (1643); Trump Marina Associates, LLC, d/b/a Trump Marina Hotel Casino (8426); TER Management Co., LLC (0648); and TER Development Co., LLC (0425).

[2] References to docket entries in the bankruptcy proceeding are denoted with "D.I."

[3] The mechanics of who may file a plan of reorganization and under what circumstances are governed by section 1121 of Title 11 of the United States Code (the "Code").  Under section 1121(b) of the Code, a debtor initially has the exclusive right during the 120 days following the filing of the petition to file a plan of reorganization, and 180 days to solicit acceptances of its plan.  11 U.S.C. § 1121(b).  This window of time is known as the "exclusive period" or the "exclusivity period."  Section 1121(d) permits a Bankruptcy Court to reduce (or increase) the debtor's exclusive periods "for cause" on request of any party in interest.

determined, after thorough consideration of a wealth of publicly-available facts, including the

Debtors' plan of reorganization and disclosure statement as well as other public filings, party

admissions, and argument of counsel, that cause existed to terminate the Debtors' exclusivity.

The Ad Hoc Committee respectfully submits that the Exclusivity Order should be affirmed.

On an appeal from an order terminating a debtor's exclusive period to file a plan of

reorganization, the standard of review for determining whether "cause" existed is abuse of

discretion. *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 642 (B.A.P. 8th Cir. 2003); *In re*

*Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 131 (D.N.J. 1995); *In re Burns & Roe Enters.,*

*Inc.*, No. 00-41610, 2005 WL 6289213, at *3 (D.N.J. Nov. 2, 2005). Factual determinations of

the Bankruptcy Court are given "great deference," *Geriatrics*, 187 B.R. at 131, and overturned

only if they are clearly erroneous, Fed. R. Bankr. P. 8013. The "clearly erroneous" standard is a

high threshold, one which cannot be met here. As explained by the District Court for the

Southern District of New York:

> A finding of fact is clearly erroneous if the court is left with the definite and firm
> conviction that a mistake has been committed. If the bankruptcy court's factual
> findings are plausible in light of the record viewed in its entirety, this court may
> not reverse it even though convinced that had it been sitting as the trier of fact, it
> would have weighed the evidence differently. Where there are two permissible
> views of the evidence, the factfinder's choice between them cannot be clearly
> erroneous.

*In re Adelphia Commc'ns Corp.*, 371 B.R. 660, 665 (S.D.N.Y. 2007), *aff'd* 544 F.3d 420 (2d Cir.

2008) (citations omitted). Legal determinations are reviewed *de novo*. *Hoffinger Indus.*, 292

B.R. at 642. To the extent that the  question presented in this appeal – whether "cause" existed

for terminating exclusivity – is a mixed question of fact and law, the reviewing court "shall apply

the appropriate standard to each component . . . ." *Geriatrics*, 187 B.R. at 131.

Here, the Bankruptcy Court was well within its discretion to terminate the Debtors'

period of exclusivity.  Upon consideration of the plan of reorganization filed by the Debtors, the

facts contained in that plan and the accompanying disclosure statement as well as in other pleadings filed in these Chapter 11 cases and in the public record, party admissions of Beal Bank, Donald Trump, and the Debtors, the fully documented plan of reorganization proposed by the Ad Hoc Committee ("Noteholder Plan"), and extensive briefing and oral argument of counsel, the Bankruptcy Court determined that the Ad Hoc Committee should be granted the opportunity to file a competing plan.  There was no error in that decision, and this Court should affirm termination of the Debtors' exclusive right to seek confirmation of its plan, which provided no recovery to any creditor other than Beal Bank and delivered exclusive control over the reorganized Debtors to Beal Bank and the Debtors' largest shareholder and alleged junior creditor, Mr. Trump.

## STATEMENT OF THE CASE

### A.   Nature of the Case

This appeal of the Debtors' period of exclusivity is brought by Beal Bank, *not* the Debtors.  Case law research did not uncover any published decision where a party other than the debtor appealed the termination of the debtor's period of exclusivity without the debtor also pursuing the appeal.  The fact that Beal Bank chose to do so here, without the support of the Debtors (or Donald Trump, for that matter), further underscores the peculiar position taken here by Beal Bank.  This fact also speaks volumes about the dysfunctionality of the entire plan process, and indeed why it was necessary to permit competition through the termination of exclusivity.

As Beal Bank, Mr. Trump and the Debtors all publicly admitted, the Debtors did *not* craft the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed by the Debtors on August 3, 2009 [D.I. 518] (as amended, the "Insider Plan").  *See* the Debtors' Objection to the Motion to Terminate [D.I. 563] ("Debtors' Obj."), at ¶¶ 1, 25; Beal Bank's Objection to the

Motion to Terminate [D.I. 560] ("Beal Obj."), at ¶ 7; Donald J. Trump's Objection to the Motion to Terminate [D.I. 557] ("Trump Obj."), at 12.  Rather than formulating their own plan of reorganization, the Debtors simply chose from among two proposals presented by Beal Bank/Donald Trump and the Ad Hoc Committee.  Indeed, at the hearing on the Motion to Terminate, counsel for Beal Bank stated that "the plan sponsors are Mr. Trump and entities that he controls . . . ."  Aug. 27, 2009 Hearing Transcript ("Hearing Tr.") at 73:18-19.

In this manner, the Debtors allowed Beal Bank and Mr. Trump to co-opt the plan process and, by doing so, essentially pre-terminated their own period of exclusivity.  At that point, the Bankruptcy Court agreed that other constituencies, such as the Ad Hoc Committee, should be permitted to compete with Beal Bank and Mr. Trump for confirmation of their plan of reorganization.[4]

Given that the Debtors stepped to the side and allowed Beal Bank and Mr. Trump to take over the plan process free of any competition, it is not surprising that the resulting plan, the Insider Plan, inured solely to the benefit of Beal Bank and Mr. Trump.  What struck the Bankruptcy Court, as evident from the hearing transcript, is the brazenness of the Insider Plan that benefitted *only* Beal Bank and Mr. Trump.  That plan reinstated the full pre-petition balance of Beal Bank's first lien debt and conferred upon Beal Bank and Donald Trump – a junior stakeholder – the exclusive right to acquire all the stock of Reorganized Debtors at a fraction of the cost to be paid under the Noteholder Plan.  The Insider Plan solicited only one vote, that of Beal Bank.  Thus, with the check of a single box, all non-insider creditors, including holders of $1.25 billion of Senior Secured Notes, would be wiped out.

---

[4] Presently, a Bankruptcy Court-appointed examiner is investigating Donald Trump's insider status and the extent to which Mr. Trump imposed any undue influence upon the Debtors in connection with the plan process.  The Bankruptcy Court was quite clear that it was not making a finding, nor did its decision rest upon any such finding, that the Insider Plan was a result of undue influence on the part of Mr. Trump.

Consequently, upon application of the principles enumerated by the United States Supreme Court in *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999) ("*LaSalle*"), to the facts and circumstances of these cases, the Bankruptcy Court had little choice but to terminate exclusivity and subject the Insider Plan to market competition such that creditors in these cases might obtain a recovery.  In *LaSalle*, the Supreme Court ruled that either "an opportunity to offer competing plans or . . . a right to bid for the same interest sought by old equity" was necessary for a prospective new value plan such as the Debtors' Insider Plan to avoid being dead on arrival or "doomed" from the start. 526 U.S. at 458.[5]  Specifically, in its decision, the Supreme Court made clear that obtaining the best price for a debtor is of primary importance, and that old equity proponents of a plan should not enjoy the benefits of exclusivity if they are not able to deliver the best price:

> If the price to be paid for the equity interest is the best obtainable, *old equity does not need the protection of exclusiveness* (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain.  There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor.

*Id.* at 456 (emphasis added).

For similar reasons, Beal Bank's oft-repeated but unsupported argument that *LaSalle* applies only to cases at the confirmation stage falls flat.  Indeed, courts interpreting *LaSalle* have relied upon that case when determining whether to modify a debtor's period of exclusivity.  *See In re Situation Mgmt. Sys.*, 252 B.R. 859, 863-64 (Bankr. D. Mass 2000) (terminating the debtors' exclusivity based on the notion of a "market test" contemplated by *LaSalle* where a new value plan has been proposed by the debtors); *In re Pliant Corp.*, Case No. 09-10443 (Bankr. D.

---

[5] A new value plan is one in which junior creditors or equity holders, over the objection of a senior class of impaired creditors, "contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity holders under a plan adopted without consideration of alternatives." *LaSalle*, 526 U.S. at 437.

Del. June 29, 2009) (granting second lien holders the right to file a competing plan and noting that "the case [was] sufficiently similar to [the *LaSalle* and *Global Ocean* cases] because all of the equity [was] being given to one creditor group"); *In re Davis*, 262 B.R. 791, 799 (Bankr. D. Ariz. 2001) (declining to extend the debtor's exclusive period and noting that to satisfy the "market test" contemplated by *LaSalle*, "*either* the right to bid for equity under a plan *or* the opportunity to propose a competing plan would suffice") (emphasis in original).

This is not a situation where case law can be found on both sides of the argument. Notwithstanding the emphasis that Beal Bank places on its limiting interpretation of *LaSalle*, Beal Bank has not cited a single case for the proposition that *LaSalle* should be limited to efforts to defeat confirmation. This Court should not set the precedent of limiting *LaSalle* to the confirmation context and overturn the proper decision of the Bankruptcy Court.

Further, Beal Bank's repeated argument that the Bankruptcy Court did not have before it facts that could form the basis for the termination of the Debtors' period of exclusivity is simply not true. The Bankruptcy Court had a wealth of facts before it, including the following: (i) the Insider Plan was not of the Debtors' own creation; (ii) the Insider Plan solicited one vote, that of Beal Bank; (iii) the Insider Plan wiped out over $1.25 billion of creditors; (iv) the Insider Plan reinstated the *full* amount of Beal Bank's pre-petition debt and afforded Beal Bank and Donald Trump the exclusive right to purchase 100% of the stock of the reorganized Debtors for only $100 million; (v) Mr. Trump was more than a mere passive investor and equity holder, despite Mr. Trump's attorneys' disingenuous attempts to portray him as such. The facts before the Bankruptcy Court concerning Mr. Trump included:

- The Debtors admitted that Donald Trump is a current shareholder of TER and maintains an indirect limited partnership interest in TER Holdings;

- Mr. Trump has asserted claims in excess of $100 million;

- Mr. Trump was Chairman of the Board of Directors, the largest shareholder and a direct a limited partner of TER Holdings until four days prior to the Petition Date (defined below);
- Mr. Trump's daughter was also a director of the Debtors until four days prior to the Petition Date; and
- Donald Trump licensed the use of his name and likeness to the Debtors, and all of the Debtors' properties bear Donald Trump's name.

The Bankruptcy Court also found that the Ad Hoc Committee had filed under seal a plan of reorganization, disclosure statement and executed backstop agreement that provided for $175 million in equity financing for the Ad Hoc Committee plan, paid Beal Bank in full pursuant to section 1129(b) of the Code, and provided a recovery to all other creditors of the Debtors' estates.

Faced with these circumstances, and what the Bankruptcy Court perceived would be substantial benefits associated with allowing competing plans to be filed, the Bankruptcy Court had more than sufficient cause to terminate the Debtors' period of exclusivity.

The Bankruptcy Court's decision was proper and was based on clearly applicable legal precedent, the undisputed facts before it and its own familiarity with the facts and circumstances of these cases. The Ad Hoc Committee respectfully submits that this Court should uphold the termination of the Debtors' period of exclusivity.

**B.**     **Course of the Proceedings**

The Ad Hoc Committee formed after the Debtors failed to make the December 1, 2008 interest payment on the Senior Secured Notes. The Debtors filed the chapter 11 cases on February 17, 2009 (the "Petition Date"), which represents the Debtors' *third* bankruptcy filing while under Mr. Trump's watch. The Bankruptcy Court accepted the Debtors' own version of the facts, namely that during their initial period of exclusivity, the Debtors purported to engage in a marketing process for the Debtors' assets, and subsequently determined that only the

7

proposals from the Ad Hoc Committee and Beal Bank were viable.  After representing to the Ad

Hoc Committee that a selection had not yet been made with respect to a plan sponsor, the Ad

Hoc Committee consented to a 45-day extension on the Debtors' exclusive periods under section

1121 of the Bankruptcy Code [D.I. 396].  With less than two hours remaining before the

expiration of their exclusivity period, on August 3, 2009, the Debtors filed the Insider Plan.

As noted above, the Insider Plan provides Beal Bank with a new secured note equal to the

balance of the pre-petition loan (in what the Ad Hoc Committee believes may result in a more

than 100% recovery for Beal Bank) and, in exchange for $100 million, delivers 100% of the

reorganized Debtors' equity to Beal Bank and Mr. Trump, while providing all other creditors

(including the $1.25 billion Senior Secured Notes) and equity holders of the Debtors' estates

with nothing.  Indeed, the Insider Plan would solicit just one vote, that of Beal Bank, while

providing for something akin to a reinstatement of Mr. Trump's allegedly abandoned limited

partnership interests in the reorganized Debtors after the effective date of the Insider Plan.

On August 11, 2009, the Ad Hoc Committee moved to terminate the Debtors' exclusive

right to file a plan [D.I. 530] so that the Ad Hoc Committee could publicly file and pursue

confirmation of the fully underwritten Noteholder Plan  that it had filed under seal with the

Bankruptcy Court as part of its motion.[6]  Unlike the Insider Plan, the Noteholder Plan provided a

recovery to all creditors of the Debtors' estates. Specifically, the Noteholder Plan provides for

the following:

- The Noteholder Plan provides that holders of the Senior Secured Notes and general unsecured creditors would be entitled to receive a pro rata share of 5% of the stock of the reorganized Debtors;

---

[6] *See* Motion to Terminate.

- The Noteholder Plan contemplates a capital contribution of $175 million (now $225 million) in new equity capital representing 75% of the new common stock of the reorganized Debtors, in the form of a rights offering backstopped by certain holders of the Senior Secured Notes (who will receive 20% of the new common stock as a backstop fee in consideration for their agreement to provide financing in connection with the Noteholder Plan), with subscription rights to participate in such offering being distributed to accredited investors;

- The Noteholder Plan further provides that Senior Secured Noteholders and general unsecured creditors that that are not eligible to participate in the rights offering because they are not accredited investors are nonetheless entitled to receive cash equal in amount to the value of the subscription rights received by accredited investors;

- The Noteholder Plan contemplates the possible sale of the Trump Marina Hotel & Casino ("Marina"), subject to higher and better offers, to Coastal Marina, LLC ("Coastal") for the net amount of $58 million – $34 million more than the value ascribed to the Marina in the Debtors' Insider Plan – and the potential dismissal of litigation between the Debtors and Coastal, resulting in the infusion of immediate value to the estate in exchange for the elimination of the large cash drain caused by the Marina's losses and the costs associated with prosecuting the litigation pending with Coastal.[7]

- Under the Noteholder Plan, Beal Bank will be entitled to receive a $75 million (now $125 million) cash pay down from the rights offering proceeds, any cash proceeds resulting from a sale of the Trump Marina, and new debt with a shorter maturity date, lower principal balance and interest rate that Beal Bank has determined to otherwise acceptable under the Insider Plan.

After full briefing from all of the parties, including papers submitted in support of the Motion to Terminate by former shareholders of the Debtors as well as Coastal and other parties, and after extensive oral argument, the Bankruptcy Court terminated the Debtors' exclusivity in a ruling from the bench on August 27, 2009 [D.I. 621]. That ruling was followed by an Order (the "Exclusivity Order"), dated August 31, 2009 [D.I. 613]. The Debtors did not appeal from the Exclusivity Order. Beal Bank, however, appealed the termination of the Debtors' exclusivity by filing a notice of appeal, and Beal Bank amended its appeal on September 10, 2009 [D.I. 650 and

---

[7] In response to the skepticism expressed by Beal Bank, Mr. Trump and the Debtors that the sale of the Marina to Coastal would occur, the Ad Hoc Committee increased the rights offering and their commitment to $225 million but did not increase the fees associated with this increased commitment. Amended Disclosure Statement for the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Ad Hoc Committee of 8.5% Senior Secured Notes Due 2015 [D.I. 775] at II.A, III.A.4.

654].  On September 16, 2009, Beal Bank also sought to stay the Bankruptcy Court's

consideration of the Noteholder Plan pending this appeal [D.I. 681] in what was essentially a

motion for rehearing.  On October 7, 2009, the Bankruptcy Court denied Beal Bank's stay

request [D.I. 800].

### C.     Statement of the Facts

#### 1.     Donald Trump's Inextricable Connections to the Debtors

A recitation of Mr. Trump's connections to the Debtors bears mentioning.  Beal Bank

misreads *LaSalle* to import an element of control and then argues that it doesn't exist in these

cases.  Indeed, Beal Bank attempts to portray Mr. Trump as a mere investor who should be

treated as any other investor in the Debtors.  These arguments amount to nothing more than a

transparent attempt to circumvent the absolute priority rule of the Code and to try to alter the

holding of the Supreme Court in *LaSalle*.  *See* Beal Bank Brief at 22 ("The Ad Hoc Committee

would have this Court believe that the law should view the Debtors' Plan differently because Mr.

Trump constitutes a financier of such plan rather than, for instance, Steven Wynn.").

Contrary to Beal Bank's flip remark, Mr. Trump is deeply rooted in these Debtors.  Mr.

Trump founded the original predecessor of the Debtors (Trump Plaza Associates) and

contributed the real properties to the Debtors.  Mr. Trump's name, of course, is literally plastered

on each of the Debtors' properties.

Mr. Trump also served as Chairman of the Board of TER (and his daughter, Ivanka

Trump, also served on the Debtors' board), he was a limited partner of TER Holdings and he was

the largest stockholder of TER.  TER Annual Report (Form 10-K) (Mar. 16, 2009) at 2, attached

as Ex. D to Insider Disclosure Statement [D.I. 519] ("TER 10-K").  While Mr. Trump purported

to abandon his partnership interests in TER Holdings four days before the Petition Date,

10

according to the Insider Disclosure Statement, Mr. Trump still holds the class B common stock of TER, which has a voting equivalency of 9,377,484 shares of TER common stock.  Insider Disclosure Statement, at VI.A.I.

In addition, Mr. Trump is party to multiple agreements with the Debtors, including a Trademark License Agreement, pursuant to which Mr. Trump has granted the Debtors the right to use his name and likeness, a Services Agreement, a Voting Agreement, a Right of First Offer Agreement and an Investment and Exchange Rights Agreement.  TER 10-K at 85-86.  All of these agreements are a matter of public record and were referenced in the TER 10-K, attached as an exhibit to the Insider Disclosure Statement.  In addition, Mr. Trump personally guaranteed up to $250 million of the Senior Secured Notes.

Additionally, Mr. Trump is a self-proclaimed junior creditor of the Debtors, having filed several proofs of claim in the Debtors' cases asserting, among other things, unsecured claims "substantially in excess of $100 million" based on alleged breaches of the Trademark License Agreement.   *See* Proofs of Claim #1081-1088, 1099-1108, copy of one Proof of Claim attached as Ex. A to Objection to Claims Filed by Donald Trump [D.I. 599].

The Bankruptcy Court had all of the above facts concerning Mr. Trump's connections to the Debtors before it when it determined that the Insider Plan may represent a new value plan and that the Debtors' period of exclusivity should be terminated.  *See* Hearing Tr. at 89 (summarizing facts before the Bankruptcy Court regarding Mr. Trump, including that "Mr. Trump was chairman of the board and held the most substantial portion of shares of this company up until four days before the filing").  There was nothing "clearly erroneous" about these factual findings. *See Adelphia Commc'ns Corp.*, 371 B.R. at 665.

2.      The Economic Stake of Senior
        Secured Noteholders in the Debtors

Beal Bank states with vehemence that it is the only creditor that is owed any recovery

upon the Debtors' emergence from bankruptcy, and that the statutory rights of all other parties in

interest under Sections 1121(d) or 1129(b) of the Code vanish merely upon a first lien lenders'

assertion as to the value of the Debtors' assets.[8]  Though relevant to confirmation, the question of

valuation is not at all relevant to the statutory right of a party-in-interest to seek to terminate

exclusivity under section 1121(d).  Beal Bank is hard pressed to explain to this Court how a

constituency with over $1.25 billion in fixed, undisputed and allowed claims fails to constitute a

party in interest to these cases.

A brief reiteration of the Debtors' relatively straightforward capital structure is key to

understanding who is owed what in this proceeding.  The Debtors owe approximately $486.8

million in first-lien debt to Beal Bank.  In addition, as part of the Debtors' prior restructuring,

the Debtors issued approximately $1.25 billion in Senior Secured Notes pursuant to that certain

indenture dated as of May 20, 2005 (the "Indenture"), by and among TER Holdings and Trump

Entertainment Resorts Funding, Inc., the Guarantors (as defined in the Indenture), and U.S. Bank

National Association, as Indenture trustee.  Insider Disclosure Statement at VI.B.  The Senior

Secured Notes are secured by a second lien on real property and certain other property of the

Debtors.  Virtually all of the Debtors' general unsecured creditors have been paid under an

extensive critical trade program that was supported by the Ad Hoc Committee and approved by

the Bankruptcy Court at the inception of the current Chapter 11 cases.  [D.I. 58.]  The Debtors

have no other creditors of any significant size and while their corporate structure is complex,

---

[8] Beal Bank also attempts to mislead the Court into believing that the Ad Hoc Committee took a position on
valuation before the exclusivity hearing.  This is simply untrue, and it is wholly irrelevant.

there is no dispute that all limited partnership and common equity interests can be viewed as out of the money equity.

The Debtors' total enterprise valuation analysis embedded in the Insider Disclosure Statement concludes that "the theoretical range of total enterprise value for the Reorganized Debtors (excluding the Trump Marina Casino) is $404 million to $464 million with a midpoint value of $434 million."  Insider Disclosure Statement at V.E.2(i).  The Debtors note that the Trump Marina Casino constitutes a cash drain and is not expected to generate positive EBITDA. *Id.* at V.E.2(ii).  Accordingly, Lazard decided to value the Trump Marina Casino separately from the Debtors' other properties, in the amount of $24 million.  *Id.*  Added to the enterprise value for the other properties, the Debtors derive a theoretical enterprise valuation range of $428 to $488 million, with a midpoint of $458 million.  *Id.*  In other words, based on this midpoint, Beal Bank is believed by the Debtors to be marginally under-secured by less than $30 million.

Beal Bank points to the Debtors' valuation repeatedly to make its claim that it is the only creditor that has any economic stake in the reorganized Debtors and therefore has the unfettered right to dictate all aspects of the Chapter 11 cases.  *See* Beal Bank Brief at 4, 5, 8, 23 and 24. Beal Bank ignores two important facts.  First, there has been no determination by the Bankruptcy Court of what the value of the Debtors' assets actually is and thus, like the never ending cry from Beal Bank regarding the Ad Hoc Committee's factual allegations, there is no evidence that was presented to the Bankruptcy Court to establish valuation.  Indeed, the Ad Hoc Committee disputes the Debtors' valuation and its financial advisor submits that the Debtors' value is high enough to put the Senior Secured Notes in the money.  In any event, as demonstrated below, whether or not the Senior Secured Noteholders are in the money or not is entirely irrelevant to the question of whether exclusivity was properly terminated.

13

### 3.     The Plan Process

On February 17, 2009, the Debtors filed their third voluntary petition for bankruptcy under Chapter 11 of the Code.  Throughout the period of time leading up to the Petition Date, the Debtors' selection and filing of the Insider Plan, and this appeal, the Debtors have taken a surprisingly passive role.  Rather than draft their own plan of reorganization, the Debtors asked Beal Bank and Mr. Trump on the one hand, and the Ad Hoc Committee, on the other, to submit proposals for the Debtors' reorganization.  *See* Debtors' Obj. at ¶ 25.  This fact was not disputed by the parties.  The Ad Hoc Committee alleged, though the Bankruptcy Court did not rest its findings upon such allegations, that throughout their period of exclusivity, the Debtors barely responded to requests of the Ad Hoc Committee for information, and ignored various requests for the Debtors to bring all the interested parties together for negotiations.  Instead, as alleged by the Ad Hoc Committee, the Debtors directed counsel for the Ad Hoc Committee to talk directly with Donald and Ivanka Trump.  In the end, the parties do not dispute that the Debtors chose to file the plan of reorganization that had been concocted by Beal Bank and Mr. Trump, *see* Debtors' Obj., at ¶26, even though the proposal of the Ad Hoc Committee would have injected more cash into the reorganized Debtors, would have reduced more debt and would have provided a recovery to all creditors of the Debtors' estates.

Ultimately, the filing by the Debtors of a plan that would give creditors (other than Beal and Donald Trump)  nothing, compared with a plan of reorganization that would afford equity to all creditors, is what prompted the Bankruptcy Court, in part, to terminate exclusivity.  Indeed, the process leading to the Debtors' adoption of the Insider Plan as their own is the subject of the investigation currently being undertaken by the Examiner.  *See* Order Granting Motion to Appoint an Examiner [D.I. 679].  The facts underlying that process, while not necessary to this

appeal of the Exclusivity Order, demonstrate that the Bankruptcy Court made the proper decision.

### 4.    Events Since the Termination of Exclusivity

Since the Bankruptcy Court terminated exclusivity, the Debtors, through Beal Bank and Mr. Trump, have amended the Insider Plan to provide a minimal recovery to Senior Secured Noteholders in the form of a $13 million cash payment to holders of $1.25 billion in secured notes.  *See* Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed October 5, 2009 ("Amended Insider Plan") [D.I. 771].  *See also* Oct. 7, 2009 Hearing Transcript at 48:7-9 (counsel for Beal Bank) ("[W]e concluded that the right thing to do was to go to the debtors and say we'll fund with additional money the $14M – 13.9 to be precise."). While this comment hints at the fact that the Debtors had ceded control over their reorganization to Beal Bank and Mr. Trump, it also demonstrates that termination of exclusivity has, in fact, benefited the Debtors' estates and resulted in some recovery to the Debtors' largest creditor body under the Insider Plan.[9]

In addition, the case continues toward a January 20, 2010 confirmation date.  The Disclosure Statements of both the Debtors and the Ad Hoc Committee have been approved, the parties have served nearly 200 discovery requests on each other, including over 60 deposition notices, and the Examiner is in the process of conducting his investigation.  While events have not quite made Beal Bank's appeal moot, the reality is that both the Insider Plan and the Noteholder Plan are nearing a confirmation hearing, and an enormous amount of resources are being spent testing the confirmability of those plans.

---

[9] The Noteholder Plan, unlike the Insider Plan, affords Senior Secured Note holders as well as general unsecured creditors the opportunity to participate in potential equity upside.  To the extent creditors are not accredited investors, under the Noteholder Plan they are entitled to receive a cash distribution. Thus, the Noteholder Plan presents a significantly better alternative for Senior Secured Note holders as compared with the Insider Plan.

## ARGUMENT

This case cried out for termination of exclusivity.  The Insider Plan would deliver 100% of the reorganized Debtors to Beal Bank and Mr. Trump, while completely wiping out $1.25 billion of debt owed to Senior Secured Noteholders.  Mr. Trump's unique position relative to these Debtors and the substantial evidence demonstrating that he was a substantial equity holder, asserted creditor and licensor, combined with the zero recovery to creditors under the initial version of the Insider Plan and the abandonment by the Debtors of any attempt to formulate their own plan, led the Bankruptcy Court to find there was a real prospect that the Insider Plan represented a new value plan that might violate the absolute priority rule and the Supreme Court's ruling in *LaSalle*, and that the Insider Plan would therefore be "doomed" from the start absent termination of exclusivity.

In an effort to overturn the proper exercise of the Bankruptcy Court's discretion, Beal Bank resorts to factual inaccuracies, hyperbole, misguided legal reasoning and misinterpretations of the Supreme Court's ruling in *LaSalle*.  Those tactics cannot carry the day.  Given the facts of this case, a number of factors, including, significantly, the application of *LaSalle* and its progeny, dictated the termination of the Debtors' period of exclusivity.  There was no error in the Bankruptcy Court's decision, and it should be affirmed.[10]

---

[10] Beal Bank decries the Bankruptcy Court's reference to case law authority for a lower burden to terminate exclusivity where the debtor is no longer in its initial period of exclusivity.  Beal Bank Brief at 25.  The Ad Hoc Committee submits that the Bankruptcy Court would have been within its discretion to apply a lower standard here because the Debtors had received an extension of exclusivity, but that no lower standard was applied in fact.

**POINT I:**
**The Bankruptcy Court's Reliance on *LaSalle* Was Entirely Appropriate**

**A.      The Bankruptcy Court Properly Relied Upon *LaSalle***
**As a Significant, but Not Exclusive, Factor in**
**Terminating the Debtors' Period of Exclusivity**

One of the significant, but not exclusive, bases for the Bankruptcy Court's termination of

the Debtor's exclusivity period was the Debtors' filing of what may be a new value plan.

Section 1129(b)(2)(B)(ii) of the Code embodies what is known as the "absolute priority rule."

That provision prohibits a junior claimant from receiving a distribution unless senior claimants

have been paid in full.  Thus, pursuant to section 1129(b)(2)(B)(ii) of the Code, the Debtors can

seek confirmation of their plan over the objection of the Senior Secured Noteholders, whom the

Debtors regard as unsecured creditors, only if their plan either pays the Senior Secured

Noteholders in full (*see* 11 U.S.C. § 1129(b)(2)(B)(i)), or provides that "the holder of any claim

or interest that is junior to the claims of such class will not receive or retain under the plan *on*

*account of* such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis

added).[11]

Prior to the *LaSalle* decision, courts disagreed as to whether a "new value" exception to

the absolute priority rule existed, whereby a junior stakeholder could receive a distribution or

retain equity in the reorganized debtor so long as the stakeholder provided new value in the form

of money or money's worth and paid fair market value for that right.  Without deciding the

question of whether such an exception existed, the *LaSalle* Court determined that the fact pattern

before it – a limited partner seeking to invest new capital in order to retain its equity interests in a

partnership so as to avoid unfavorable tax consequences without paying the secured creditor in

---

[11] In other words, if no junior creditor or equity holder receives a distribution "*on account of* such junior claim or
interest," then the Debtors may seek to confirm the Insider Plan over the objection of the Senior Secured
Noteholders (provided certain other conditions to confirmation are met which cannot be met here).

full, much like the present case – represented a *per se* violation of the absolute priority rule.  The Supreme Court was concerned with "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners," *LaSalle*, 526 U.S. at 444, a danger that would come to fruition in the present case if the Insider Plan proceeded to confirmation without competition from another plan.

In *LaSalle*, the Supreme Court held that a new value plan proposed by an equity holder of the debtor must be subjected to a market test, including in the form of a competing plans:

> Whether a market test would require an opportunity to offer *competing plans* or would be satisfied by a right to bid for the same interest sought by old equity is a question we do not decide here.  It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

*LaSalle*, 526 U.S. at 458 (emphasis added).

After considering the *LaSalle* decision, together with its progeny, the Bankruptcy Court correctly concluded that the Debtors' pre-plan marketing efforts were insufficient as a "market test," and the termination of exclusivity to allow for competing plans to be filed was warranted. Hearing Tr. at 90:7-21.

Nowhere mentioned in Beal Bank's erroneous and repeated refrain that *LaSalle* is limited to confirmation, is the fact that bankruptcy courts have looked to *LaSalle* in deciding whether to terminate exclusivity.  *See, e.g.*, *Situation Mgmt.*, 252 B.R. at 863-64 (relying on *LaSalle* in terminating exclusivity); *In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000) (stating the market test required by *LaSalle* may be achieved through the termination of exclusivity); *In re Pliant Corp.*, Case No. 09-10443 (Bankr. D. Del. June 29, 2009) (terminating exclusivity because plan filed by debtors was sufficiently analogous to situation in *LaSalle*).

In *Situation Management*, the Bankruptcy Court based its decision to terminate the debtor's exclusivity on the authority of *LaSalle*. 252 B.R. at 863-65.  The court noted that the best way to accomplish the "marketplace validation" contemplated by the Supreme Court in *LaSalle* was "to permit other parties to propose plans of reorganization that may garner creditor support to compete when the debtor moves for confirmation of an unsecured creditor cramdown plan."  *Id.* (citation omitted); *see also In re SM 104 Ltd.*, 160 B.R. 202, 225 (Bankr. S.D. Fla. 1993) (observing that competing plans provide a better method for valuation of reorganized equity interests when new value plans are proposed).[12]  Here too, the Bankruptcy Court found that Insider Plan may constitute a new value plan that resembles the type of plan about which the Supreme Court expressed such concern in *LaSalle*.  Mr. Trump is a "prebankruptcy equity holder" of the Debtors – he was "chairman of the board and held the most substantial portion of shares of this company up until four days before the filing."  Hearing Tr. at 89:5-7.  Further, the Insider Plan would involve Mr. Trump's "contribut[ion of] new capital and [receipt of] ownership interests in the reorganized entity."  *LaSalle*, 526 U.S. at 437.  The Insider Plan also provides the opportunity to contribute new capital and receive ownership interests exclusively to Mr. Trump, the old equity holder, and Mr. Trump's bank, Beal Bank.  *See* Insider Disclosure Statement at III.A.1.  On the other hand, the holders of the largest portion of the Debtors' outstanding debt, the Senior Secured Noteholders who are owed $1.25 billion and who hold claims senior to the claims and interests of Mr. Trump, would, under the Insider Plan as amended

---

[12] Beal Bank relies heavily on the decision in *In re Geriatrics Nursing Home*, 187 B.R. 128, 131 (D.N.J. 1995). This reliance is misplaced because the facts here are far removed from those in *Geriatrics*.  Unlike this case, *Geriatrics* did not involve a prospective new value plan that potentially violates the absolute priority rule.  Also, unlike this case, the creditor who challenged exclusivity was being paid in full over time.  And unlike this case, that creditor only proposed the hypothetical possibility of a competing plan in the future, not a completely drafted and funded and documented competing plan like the Noteholder Plan.  Here, however, all creditors other than and Beal Bank are being wiped out.

on October 5, 2009, receive only a nominal recovery. Amended Insider Disclosure Statement at II.D.4; Amended Insider Plan, at 4.4.[13]

This legal conclusion is supported by common sense. Under *LaSalle,* the termination of exclusivity in the face of a new value plan is appropriate, even necessary, to avoid a situation where a new value plan is denied at the confirmation stage, only to have to go back to square one to start the process over. The opposite conclusion, urged by Beal Bank, is not only incorrect, it would make no practical sense. If a court determines that a debtor's plan offers an exclusive right to a junior interest holder to provide new value to acquire the stock of the reorganized debtor to the detriment of other creditors, there would be no reason for the court to either (a) approve a disclosure statement, permit solicitation and then deny confirmation to permit parties other than the debtor to propose a plan or (b) find that competition would benefit creditors, but deny them the right to compete. This is precisely why *LaSalle* has been interpreted as applicable to terminating exclusivity prior to confirmation.

The Bankruptcy Court correctly determined that *LaSalle* directed that the Debtors' exclusivity period should be terminated under the facts of these cases.

_____

[13] Beal Bank's reliance on the Bankruptcy Court's decision denying a motion to terminate exclusivity in the Debtors' prior bankruptcy is inapposite, *In re THCR/LP Corp.*, Case No. 04-46898 (Bankr. D.N.J. 2005). In fact, the distinctions between this case and the situation in *THCR/LP* actually illustrate why exclusivity was appropriately terminated here. First and foremost, the debtor plan in *THCR/LP* proposed to pay creditors in full. Indeed, creditors in *THCR/LP* opposed the motion of the equity committee in that case to terminate exclusivity. Moreover, the *THCR/LP* plan, unlike the Insider Plan here, did not give Mr. Trump an exclusive right to buy equity, but allowed all shareholders to buy in at the same price. Nor did the objecting equity committee in *THCR/LP* have a concrete plan ready to file in competition with the debtor's plan. *See* Transcript of February 23, 2005 Hearing in *THCR/LP*, at 103-112. Indeed, there be no greater authority as to the application of the Bankruptcy Court's prior decision than the Bankruptcy Court itself.

B.     *LaSalle* **Applies to Donald Trump, an Old**
       **Equity Holder, an Insider and a Junior Creditor**

Beal Bank is constrained to argue that the facts of *LaSalle* are distinguishable from the

present case by claiming that Donald Trump is not the type of old equity holder to whom *LaSalle*

applies.  Such distinctions are without substance.

First, Beal Bank's argument that *LaSalle* applies only where an equity holder held a

"controlling equity position," Beal Bank Brief at 18, is simply wrong.   The focus of *LaSalle* was

"plans providing *junior interest holders* with exclusive opportunities free from competition and

without benefit of market valuation."  526 U.S. at 458 (emphasis added).  *See also* Hearing Tr. at

45: 4-9 ("In fact, didn't Justice Souter focus on the causal connection between the submission of

the plan via the exclusivity period and the identity – not the control, but the identity of the new

value contributor – in that case, the old partners – who have the benefit of the exclusivity

opportunity[?]").  What concerned the Supreme Court was not whether the equity holder

controlled the Debtors, but whether the plan afforded the equity holder a distribution in the form

of an exclusive property right to acquire new stock by virtue of the Debtors' period of

exclusivity, which is precisely what will happen here if the Insider Plan is permitted to move to

confirmation untested by the market, as mandated by *LaSalle*.  The *LaSalle* Court did not require

that the equity holder be a controlling shareholder or insider.

Second, Beal Bank's attempts to downplay the role of Donald Trump vis-à-vis the

Debtors strain credulity.  Indeed, contrary to characterizations in Beal Bank's appeal brief, Beal

Bank's counsel stated in open court that "the plan sponsors are Mr. Trump and entities that he

controls . . . ."  Hearing Tr. at 73:18-29.  Beal Bank ignores the fact that each of the Debtors'

properties bears Mr. Trump's name.  It was not clearly erroneous for the Bankruptcy Court to

conclude that Mr. Trump was more than a passive outside investor or equity holder in a debtor

21

that bore his name, under a plan of reorganization that initially sought to pay senior creditors with $1.25 billion in claims absolutely nothing.

As a point of reference, Mr. Trump has a much closer relationship with each of the Debtors than persons identified as old equity holders in case law.  Courts interpreting *LaSalle* have determined that "old equity holders" include an asset manager who owned the majority of the stock of the debtor, *In re PWS Holding Corp.*, 228 F.3d 224, 229 (3d Cir. 2000), a controlling shareholders' daughter, *Global Ocean Carriers*, 251 B.R. at 49, and former shareholders and an insider, *In re MJ Metal Prods., Inc.*, 292 B.R. 702, 705 (Bankr. D. Wyo. 2003).  Here, Mr. Trump's numerous connections to the Debtors, and Beal Bank's insistence that the "most distinguishing feature" of the Debtors is "the Trump brand," Beal Bank Brief at 7, *see also id.* at 22-23, each as laid out in the public record of these cases, make it clear that Donald Trump is more than "any old holder of old equity," Beal Bank Brief at 20, vis-à-vis Trump Entertainment Resorts and the other Debtors.

Third, Beal Bank fails to comprehend that a plan is "doomed" if it "vest[s] equity in the reorganized business in the Debtor's partners *without extending an opportunity to anyone else* either to compete for that equity or to propose a competing reorganization plan."  *LaSalle*, 526 U.S. at 454 (emphasis added).  Here, by virtue of the Debtors' period of exclusivity, Donald Trump was being afforded the exclusive right to acquire 50% of the stock of the reorganized Debtors, while Senior Secured Noteholders would receive nothing, with no opportunity to compete for the equity of the reorganized Debtors.

Beal Bank complains that the Bankruptcy Court's ruling effectively limits who Beal Bank may "choose to be its partner," Beal Bank Brief at 14.  It is not that the inclusion of Mr. Trump in the Insider Plan is, alone, a "fatal flaw," *LaSalle*, 526 U.S. at 457.  Rather, it is the

inclusion of Mr. Trump, the handing to Mr. Trump of 50% of the equity of the reorganized

Debtors, the exclusion of the Senior Secured Noteholders from the possibility of competing for

the equity, and the status of Mr. Trump as an equity holder, significant player (if not insider), and

a junior stakeholder that, together, "doom" the Insider Plan.  No one is limiting whom Beal Bank

may choose to "partner" with, just so long as the provisions of the Bankruptcy Code as to the

Senior Secured Noteholders' rights are not violated.

**C.**    **The Insider Plan Has Not Been Exposed to the Market**

Beal Bank claims that the Insider Plan meets the requirements of *LaSalle* because the

Debtors' assets were marketed prior to the filing of the Insider Plan.  Contrary to its own mantra

decrying the lack of evidence before the Bankruptcy Court, Beal Bank simply asserts, without

evidence, that "exhaustive market testing" was conducted, and that "the Debtors ran an open and

competitive process."  Beal Bank Brief at 21.

However, the Bankruptcy Court was well founded in its determination that the pre-filing

marketing of the Debtors' assets is wholly insufficient to address the *LaSalle* concerns.  Indeed,

allowing a debtor to circumvent LaSalle in such a fashion would be akin to asking the fox to

guard the hen house.  Specifically, the Supreme Court questioned at length why an old equity

holder would guard a debtor's exclusivity with the zealousness shown by Mr. Trump here:

> Given that the opportunity is property of some value, the question arises why old
> equity alone should obtain it, not to mention at no cost whatever.  The closest
> thing to an answer favorable to the Debtor is that the old equity partners would be
> given the opportunity in the expectation that in taking advantage of it they would
> add the stated purchase price to the estate. . . .  But this just begs the question why
> the opportunity should be exclusive to the old equity holders.  If the price to be
> paid for the equity interest is the best obtainable, old equity does not need the
> protection of exclusiveness (unless to trump an equal offer from someone else); if
> it is not the best, there is no apparent reason for giving old equity a bargain.
> There is no reason, that is, unless the very purpose of the whole transaction is, at
> least in part, to do old equity a favor.  And that, of course, is to say that old equity
> would obtain its opportunity, and the resulting benefit, because of old equity's
> prior interest within the meaning of subsection (b)(2)(B)(ii).

*Id.* at 456 (citation omitted).  To safeguard against an old equity holder achieving a recovery

when creditors are not paid, the Supreme Court expressed the need for market exposure:

> [I]t would, of course, be a fatal flaw if old equity acquired or retained the property
> interest without paying full value.  It would thus be necessary for old equity to
> demonstrate its payment of top dollar, but this it could not satisfactorily do when
> it would receive or retain its property under a plan giving it exclusive rights and in
> the absence of a competing plan of any sort.  . . . [T]he *best way* to determine
> value is exposure to a market."

*Id.* at 457 (emphasis added).

The market test ruling of *LaSalle* must "involve either competing plans of reorganization

or a right for third parties to bid for the same interest sought by old equity."  *In re CGE Shattuck,*

*LLC*, Case No. 99-12287, 1999 Bankr. LEXIS 1880, at *19 (Bankr. D.N.H. Dec. 20, 1999).

Sufficient market exposure was found in a case where market testing for possible transactions

had been conducted for more than two years prior to the filing of the chapter 11 proceeding,

including exploration with over 100 firms.  *MJ Metal Prods., Inc.*, 292 B.R. at 705; *see also In re*

*Adelphia Commc'ns Corp.*, 336 B.R. 610, 644 (Bankr. S.D.N.Y. 2006) (suggesting that

exclusivity may be terminated where a debtor "spurn[s] a testing of the value of the company in

the marketplace").

In stark contrast, here, the Debtors have not achieved "top dollar" for their enterprise by

adopting the Insider Plan, and they have done virtually nothing to submit themselves to the

market.  Rather, the Debtors have adopted a plan, crafted by Mr. Trump and his bank, that would

hand the reorganized Debtors over to that insider and his bank, for $100 million, when the Ad

Hoc Committee has offered to pay $225 million in cash for the same equity, and all creditors

would have a right to a recovery.  While the Examiner is currently investigating whether the

Debtors' request for a plan proposal from the Ad hoc Committee was a legitimate request or

whether, as it appears, the request was nothing more than a ruse to create the appearance of

24

market testing, the fact remains that the Debtors chose a plan that would pay significantly less into the estate than the option presented by the Ad Hoc Committee.  This is precisely the type of scenario that the Supreme Court ruled was in violation of the absolute priority rule, and a bald assertion of "marketing" by the one creditor who would benefit from the Insider Plan cannot overcome such violation.  The Bankruptcy Court's opening of the process to a competing plan should be affirmed.

**D.     Members of the Ad Hoc Committee Have a
        Large Economic Stake in the Outcome of This
        <u>Bankruptcy Case – To the Tune of $1.25 Billion</u>**

Beal Bank repeatedly states that it is the only interest holder who has an economic stake in the Debtors.  These statements are not only wrong, they underscore the desperate attempts by Beal Bank and Donald Trump to acquire the Debtors for a fire sale price – to the exclusion of all others.  In any event, the valuation of the Debtors is an issue for confirmation and is irrelevant to the question of exclusivity.  In its pleadings, Beal Bank ignores the existence of sections 1121(d) and 1129(b) of the Bankruptcy Code.  However, Section 1121(d) expressly confers upon any "party in interest" the statutory right to seek to terminate exclusivity.  11 U.S.C. § 1121(d).  There is no requirement in the statute that a party seeking termination of exclusivity must obtain the consent of the secured lender before doing so.

Moreover, Beal Bank's personal preferences aside, the cramdown provisions of the Bankruptcy Code apply with equal force to secured (or undersecured) creditors or parties in interest.  One of the most fundamental components of Chapter 11 is that a plan may be confirmed over the negative vote of a secured creditor so long as the requirements in section 1129(b) of the Bankruptcy Code are met and the creditor receives the net present value of its claim – in other words, paid in full.  Cramdown of secured creditors is available under the Bankruptcy Code and nowhere in case law (Beal Bank of course cites no cases) or anywhere in

the Bankruptcy Code or other law is it mandated that a creditor class who a senior creditor class thinks is out of the money has no rights.  Under Beal Bank's version of the Code, once a senior lender and a debtor agree on a value that puts other creditors out of the money, they should have their interests cancelled and should never be heard of again and have all of their rights stripped away from them.  Congress intended no such result.

As discussed *supra*, the Senior Secured Noteholders are owed approximately $1.25 billion by the Debtors.  They are not disinterested observers, and they have not conceded that they are out of the money.  *Compare* Beal Bank Brief at 23.  The attempt of Beal Bank and Donald Trump to completely erase $1.25 billion in debt, and to give the reorganized company to an out-of-the-money old equity holder in the process, is nothing short of astounding.   Whether the Senior Secured Notes are in or out of the money is wholly irrelevant.  What matters is that the claims arising under the Senior Secured Notes are allowed and undisputed, and that the holders of the notes represent parties in interest, entitled under the Bankruptcy Code to salvage their investment in the Debtors provided they pay the secured lender in full.  Here, the Noteholder Plan does just that.[14]

Further, Beal Bank's statement that "*LaSalle* is inapplicable where the objecting party fails to establish that it has an economic stake in the outcome of a bankruptcy case," Beal Bank Brief at 14, not only inaccurately implies that the members of the Ad Hoc Committee do not have an economic stake in the outcome of the Debtors' reorganization, it is not supported by the Supreme Court's decision.  *LaSalle* did not state that a particular party had to prove its economic stake.  Rather, an interest holder junior in the capital structure of a debtor, such as Donald

---

[14]   Indeed, reported decisions involving the cram-up of a secured creditor invariably involve a junior creditor or equity holder that is purportedly out of the money that seeks to infuse capital into the reorganized business in order to inject equity value.

Trump, cannot surpass a more senior interest holder, such as the Senior Secured Noteholders, on account of an old equity position.  526 U.S. at 458 ("[P]lans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).").

Beal Bank also states that the Ad Hoc Committee seeks to "extort a payment from Beal Bank" by the filing of the Noteholder Plan, Beal Bank Br. at 24, and suggests that the purpose of bankruptcy is not "to foster the best recovery for all creditors," *id.* at 23.  But an attempt by holders of $1.25 billion in notes to obtain some recovery is far from extortion, and "maximizing property available to satisfy creditors" *is* one of the "two recognized policies underlying Chapter 11." *LaSalle*, 526 U.S. at 453.  *See also Toibb v. Radloff*, 501 U.S. 157, 163-64 (1991) ("Chapter 11 . . . embodies the general Code policy of maximizing the value of the bankruptcy estate."). Clearly Beal Bank has forgotten about this general policy goal, as its repeated assertions that it is the only creditor who is due a recovery make clear.

### POINT II:
### Factors Other Than *LaSalle* Made the Termination of Exclusivity Appropriate

The Bankruptcy Court indicated it was relying significantly, but not exclusively, upon *LaSalle* as the basis for termination of exclusivity.  The Bankruptcy Court's decision is also well grounded in the various factors that courts have analyzed in determining whether to modify the exclusivity of a debtor, including: the size and complexity of the case, the time necessary to permit the debtor to negotiate a reorganization plan and prepare sufficient information, whether the debtor is paying its debts as they become due, whether the debtor has shown reasonable prospects for filing a viable plan, whether the debtor has made progress negotiating with creditors, the length of time a case has been pending, whether the debtor is seeking an extension to pressure creditors, and whether or not unresolved contingencies exist.  *See In re Cent. Jersey*

27

*Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).

Specifically, courts have found that cause existed to terminate exclusivity (or, conversely, that no cause existed to extend exclusivity) in several situations analogous to that presented by the present case:

- Termination of exclusivity is appropriate where a debtor fails to make good faith progress with its creditors, *see In re Lake in the Woods*, 10 B.R. 338, 345-46, (E.D. Mich. 1981), or where negotiations between a debtor and creditor break down, *see In re R.G. Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007). Here, the Insider Plan is the result of a process in which the Debtors failed to hold negotiations in good faith with their largest creditor body, the Senior Secured Noteholders. In addition, the Debtors failed to develop their own plan of reorganization and stayed on the sidelines during all stages of the petition.

- Exclusivity may be terminated where the debtor used its period of exclusivity to hold creditors "hostage" to a plan they did not support. *In re Pub. Serv. Co. of N.H.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988); *see also In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992). Here, rather than hold creditors hostage, the Debtors chose to execute the hostages by depriving them of any recovery.

- Termination of exclusivity is also appropriate where the nature of the debtor's plan made it clear that the reorganized company had upside potential, but not all creditors were given a right to compete for the upside. *See In re Pliant Corp.*, Case No. 09-10443 (Bankr. D. Del. June 29, 2009). Here, Beal Bank and Mr. Trump are attempting to retain all the equity of the Debtors for themselves, a clear sign that they see upside in the company. As in *Pliant*, the Debtors' creditors should be given a chance to compete for the upside.

While *LaSalle* is more than sufficient authority upon which to terminate the Debtors' exclusivity, other case law also establishes cause for termination. As Beal Bank points out, "courts look to see whether the debtor is taking advantage of the process or is otherwise dysfunctional in its attempts to craft a reorganization plan." Beal Bank Brief at 28. The process engaged in by the Debtors, in which they allowed themselves to be completely co-opted by Beal Bank and Donald Trump – even to the extent that *Beal Bank* is appealing the termination of the *Debtors'* period of exclusivity – is the height of "dysfunctionality." Cause existed for the

termination of exclusivity, and this Court should affirm the Exclusivity Order of the Bankruptcy Court.

## POINT III:
### The Record Before the Bankruptcy Court Contained
### Ample Evidence for the Exclusivity Determination

Ultimately, the Bankruptcy Court had sufficient evidence before it to terminate exclusivity, including "the matters of public record . . . , the nature of the plan that's proposed, the context in which it's proposed, the timeframes and context in which the negotiating process went forward . . . ." Hearing Tr. at 6:23-7:1. Reliance on those sources, which contain more than adequate facts upon which to base the termination of the Debtors' period of exclusivity,[15] was entirely proper. Indeed, at the exclusivity hearing, counsel for Beal Bank agreed that "we can take Judicial notice of what's in the record. I agree, the Court obviously can take Judicial notice of what's in the record." Hearing Tr. at 74:3-5.

Beal Bank now contradicts what it stated in open court, asserting that because the Bankruptcy Court did not conduct an evidentiary hearing, the ruling of *LaSalle* cannot apply. Beal Bank Brief at 13-14, 17. *LaSalle* imposed no requirement of a full evidentiary hearing, and this Court should not read such a requirement into *LaSalle*. Further, in the circumstances of this case, where the facts necessary to determine whether termination of exclusivity was appropriate were found in public filings and party admissions, an evidentiary hearing was not required.

The Federal Rules of Evidence permit a court to take judicial notice of a fact that is "not subject to a reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

---

[15] In its brief, Beal Bank makes the unsupported statement that "[a] court is . . . required to make certain findings of fact and reach certain legal conclusions in order to determine that a plan violates the absolute priority rule in the manner described in *LaSalle*." Beal Bank Brief at 17. *LaSalle* includes no mandate that "certain findings of fact" must be made, and Beal Bank has pointed to no authority for this assertion.

sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b).  *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (finding that facts contained in publicly available SEC filings are among the type of facts of which a court may take judicial notice).  In addition, "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound." *Am. Tissue, Inc. v. Donaldson Lufkin & Jennette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004)  (citations omitted).  *See also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003); *Donald M. Durkin Contracting, Inc. v. City of Newark*, No. CVIA 04-163 (GMS), 2006 WL 2724882, at *6 (D. Del. Sept. 22, 2006) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.") (citations omitted).

Here, Beal Bank claims that the Bankruptcy Court failed to adduce any evidence and that in itself presents reversible error.  But the Bankruptcy Court had before it the Insider Plan and Disclosure Statement, the Noteholder Plan and Disclosure Statement, SEC filings that were attached as exhibits to the Insider Disclosure Statement and various pleadings, numerous other pleadings and other filings, and statements made by counsel for the Debtors, Mr. Trump and Beal Bank in court.  No testimony from witnesses or evidentiary hearing was needed to establish the facts contained in these sources, which in themselves gave the Bankruptcy Court sufficient grounds to terminate exclusivity.

Facts that underpinned the Bankruptcy Court's Exclusivity Order included the following facts:

- The nature of the terms of the Insider Plan itself, including the grant of an exclusive right to Donald Trump and Beal Bank to acquire 100% of the stock of the reorganized Debtors, and the absence of a recovery to creditors under the Insider Plan other than to Donald and Beal Bank, *see* Insider Disclosure Statement at II.A, II.B, II.D;

- The Debtors had acknowledged that the Insider Plan was not a plan independently created by the Debtors, *see* Insider Disclosure Statement at V.D;

- The presence of the alternative plan of reorganization prepared by the Ad Hoc Committee, and the fact that the Noteholder Plan was underwritten, documented and ready to be solicited, *see* Noteholder Plan, attached as Exhibit A to the Motion to Terminate;

- The absence of any harm to the estates were exclusivity to be terminated; and

- The estates would likely be benefited were exclusivity to be terminated.

Other facts that underpinned the Bankruptcy Court's termination of the Debtors' period of exclusivity went to the nature of Mr. Trump's relationship with the Debtors.  The facts before the Bankruptcy Court showed that Mr. Trump had been chairman of the board of the Debtors until four days before the Petition Date.  *See* TER 10-K at 2.  When asked whether Mr. Trump's counsel would "contest the basic proposition that until February 13th, Mr. Trump was chairman of the board and owned 23 percent limited partnership interest in the debtors?", Mr. Trump's counsel responded "I do not contest that at all."  Hearing Tr. at 74.

The Bankruptcy Court also had filings before it showing Mr. Trump's equity ownership of TER, one of the Debtors.  Insider Disclosure Statement at VI.A.I ("The issued and outstanding shares of class B common stock are held by Mr. Trump and have the voting equivalency of 9,377,484 shares of TER common stock.").  Further, the Bankruptcy Court had at its disposal Mr. Trump's admissions that he purports be a "substantial" creditor of the Debtors, Trump Obj. at 2, and that he is the sole owner of ACE Entertainment Holdings, Inc., a limited partner in TER Holdings, Trump Obj. at 7, n. 2.  In addition, SEC filings of the Debtors show that Mr. Trump beneficially owned 29.15% of the common stock of TER (and/or common stock equivalents) on a fully-diluted basis.  *See* TER 10-K at 11-12.  The Bankruptcy Court had a more than sufficient evidentiary basis upon which to determine that Mr. Trump was an old equity holder and a junior stakeholder.

In addition, the facts before the Bankruptcy Court established that Mr. Trump had numerous other connections to the Debtors. The Debtors' Form 10-K lists several connections to Mr. Trump and his organization, including:

- The Trademark License Agreement gives the Debtors a perpetual, exclusive and royalty-free license to use Mr. Trump's name and likeness in connection with its casino and gaming activities;

- Mr. Trump has personally guaranteed up to $250,000,000 of the Senior Secured Notes;

- Mr. Trump has various rights vis-à-vis the Debtors pursuant to the TER Holdings Partnership Agreement and the Services Agreement between Mr. Trump, TER, and TER Holdings, whereby Mr. Trump agreed to provide certain services in exchange for an annual fee of $2 million, plus a bonus and expense reimbursement in exchange for his assistance in marketing and advertising and the maintenance of his own license by the New Jersey Casino Control Commission to serve as Chairman of the Board of the Company;

- The Right of First Offer Agreement provides the Trump Organization, LLC with a three-year right of first offer to serve as manager or contractor with respect to construction and development projects;

- The Voting Agreement gives Mr. Trump the right to remove certain members from the Board of the Debtors; and

- The Debtors have engaged in "various transactions" with other entities owned by Mr. Trump, including leasing office space and using Mr. Trump's airplane and golf-courses.

*See* TER 10-K at 2, 58-59, 85-86.

Thus, the Bankruptcy Court had more than adequate evidence, in the form of information in the Insider Plan and Disclosure Statement, public filings attached as exhibits to the Insider Disclosure Statement, and party admissions, to conclude that Mr. Trump – an old equity holder (if not an insider) and a junior stakeholder – would, under the Insider Plan, receive equity in the reorganized Debtors to the exclusion of senior creditors. Because this information provided the Bankruptcy Court more than sufficient cause to terminate the Debtors' period of exclusivity, an evidentiary hearing not only was not necessary, it would have been duplicative.

## <u>CONCLUSION</u>

For the reasons stated herein, the Ad Hoc Committee respectfully requests that this Court affirm the decision of the Bankruptcy Court terminating the Debtors' period of exclusivity.


Dated: November 9, 2009                    Respectfully submitted,

                                           **LOWENSTEIN SANDLER PC**

                                           By:    /s/ *Jeffrey D. Prol*
                                           _____
                                           Kenneth A. Rosen
                                           Jeffrey D. Prol
                                           65 Livingston Avenue
                                           Roseland, New Jersey 07068
                                           Tel:  973-597-2500
                                           Fax:  973-597-2400
                                           Email:  krosen@lowenstein.com
                                                   jprol@lowenstein.com

                                           **STROOCK & STROOCK & LAVAN LLP**
                                           Kristopher M. Hansen
                                           James L. Bernard
                                           Jennifer C. Arnett
                                           180 Maiden Lane
                                           New York, New York 10038
                                           Tel:  212-806-5400
                                           Fax:  212-806-6006
                                           Email:  khansen@stroock.com
                                                   jbernard@stroock.com
                                                   jarnett@stroock.com

                                           *Co-Counsel to the Ad Hoc Committee of Holders of 8.5%*
                                           *Senior Secured Notes Due 2015*